UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BRIAN J. O'DONOGHUE, as authorized representative,<br><br>Plaintiff,<br><br>v.<br><br>INLAND BANK AND TRUST,<br><br>Defendant. | Case No. 1:15-cv-11603<br><br>**COMPLAINT** |

Brian J. O'Donoghue, as authorized representative of College Savings Bank (the "Plaintiff"), by and through his attorneys William A. Charron and Eric M. Fishman of Pryor Cashman LLP, hereby alleges as and for the Complaint against Inland Bank and Trust ("Inland") as follows:

**PARTIES**

1. Plaintiff Brian J. O'Donoghue is an individual residing in New York, New York, and therefore is a citizen of New York.

2. Under an Assignment and Assumption Agreement, College Savings Bank assigned all of its rights, title and standing to pursue any claim, cause of action or litigation that College Savings Bank ("CSB") may have arising from the failure of Inland to consummate the transactions contemplated by a certain merger agreement (described below) to its shareholder representative, Mr. O'Donoghue.

3. Defendant Inland is an FDIC-insured Illinois state chartered bank, duly authorized to do business under the laws of Illinois, and having a principal place of business in Oak Brook, Illinois.

## JURISDICTION AND VENUE

4. This Court has original jurisdiction over the parties to this action under 28 U.S.C. § 1332 as this action is between citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.

5. Moreover, under Section 13.3 of the merger agreement (described below), this Court has exclusive jurisdiction to hear this dispute.

6. Venue is proper in this district under 28 U.S.C. § 1391(a) as Inland resides and transacts business in this judicial district.

## RELEVANT FACTS

**A.  CSB And Inland Execute Merger Agreement**

7. CSB was a New Jersey-based bank specializing in, among other things, issuing certificates of deposit under college savings programs that qualified for the tax advantages set forth in Section 529 of the U.S. Internal Revenue Code.

8. In early 2014, CSB and Inland, an Oak Brook, Illinois-based regional bank, entered into discussions regarding a potential merger of the two banks.

9. Negotiations ensued, and on or about October 22, 2014, the parties executed an Agreement and Plan of Merger (the "Merger Agreement").

10. The Merger Agreement set forth the terms and conditions under which CSB would merge with and into Inland, with Inland being the Resulting Bank (the "Merger"). CSB and Inland agreed to consummate the transaction after they had satisfied numerous conditions

which were specified in the Merger Agreement, including but not limited to obtaining approval from various regulatory authorities such as the Federal Deposit Insurance Corporation (the "FDIC"). The date that the parties were to consummate the transaction is defined in the Merger Agreement as the "Closing Date."

11. The parties made numerous representations and warranties in the Merger Agreement.

12. Of particular importance was Inland's representation regarding its ability to obtain required approvals from the FDIC and other regulatory authorities. The regulatory representation was chiefly important given that in or about November 2012, Inland entered into a Consent Order with the FDIC which effectively barred Inland from making acquisitions.

13. Because of the Consent Order, CSB required assurance from Inland that it had addressed any and all areas of FDIC concern that had been the basis for the Consent Order, such that Inland could represent to CSB that there were no longer any impediments (to Inland's belief or knowledge) to Inland receiving approval from the FDIC and other regulatory authorities to enter into the Merger.

14. Inland provided those assurances. Under Section 5.6 of the Merger Agreement, Inland represented that "there is no reason why the granting of any of the Regulatory approvals required to be obtained by Inland to consummate the Contemplated Transactions would be denied or unduly delayed beyond a date which is five (5) months after the Agreement Date."

15. Inland also promised to "diligently pursue in good faith and use its Best Efforts to obtain and/or satisfy all regulatory approvals and requirements necessary to consummate the Contemplated Transactions."

16. "Best Efforts" is a defined term in the Merger Agreement that requires Inland to act as a "prudent Person desirous of achieving a result would use in similar circumstances to ensure that such result is achieved as expeditiously as possible . . ."

17. Thus, Inland had agreed to diligently exercise its good faith to obtain all regulatory approvals.

18. Moreover, under Section 7.5(b) of the Merger Agreement, Inland could not, without CSB's prior written consent, "take any affirmative action, or fail to take a reasonable action within its control, the effect of which would be to materially impair, delay or prevent the consummation of the Contemplated Transactions."

19. As part of the Merger, Inland demanded that CSB satisfy numerous conditions prior to the Closing Date.

20. One major condition was CSB's obligation to sell all of its investment assets prior to the Closing Date. CSB's assets comprised two main investment products: (1) federally guaranteed student loans ("Student Loans"); and (2) mortgage-backed debt securities ("MBS" and together with the Student Loans, the "CSB Investment Assets").

21. The CSB Investment Assets were safe investments that provided a profitable yield to CSB.

22. Nevertheless, Inland insisted that CSB sell the CSB Investment Assets before the Closing Date so that Inland could begin investing the resulting cash in loans that Inland intended to make immediately following closing of the Merger.

23. The obligation to sell the CSB Investment Assets was a heavily negotiated closing condition. The parties, who are experienced community bankers, specifically discussed how once CSB sold the CSB Investment Assets, CSB would be in the disadvantaged position of

holding only cash as its income-producing asset while paying a relatively high rate of interest on its deposit obligations.

24. Accordingly, the sale of the CSB Investment Assets was established in the Merger Agreement as the final material closing condition (*i.e.*, after Inland performed under its Regulatory Representation), after which it was contemplated that the Merger would close no more than two days following the sale of all CSB Investment Assets.

B. **Inland Initially Receives Regulatory Approval For Merger Transaction**

25. After the parties executed the Merger Agreement, they immediately undertook to satisfy the terms and conditions that were necessary to consummate the Merger.

26. On or about October 30, 2014, Inland's counsel filed an Interagency Bank Merger Act Application for the merger of CSB with and into Inland (the "Application") with at least three regulatory agencies: the FDIC, the Illinois Department of Financial and Professional Regulation, and the New Jersey Department of Banking and Insurance.

27. On December 23, 2014, the FDIC approved the Merger in an Order and Basis for Corporation Approval (the "FDIC Approval"). In the FDIC Approval, the FDIC stated:

> Having found favorably on all statutory factors and having considered other relevant information, including any reports on the competitive factors furnished by the Comptroller of Currency, the Board of Governors of the Federal Reserve System and the Attorney General of the United States, it is the [FDIC's] judgment that the application should be and hereby is approved.

28. In January and February 2015, the State of New Jersey and the State of Illinois also granted their approvals for the Merger, respectively.

5

C. **Inland Assures CSB That The Closing Date Is Imminent And Instructs CSB To Sell The CSB Investment Assets As The Final Material Closing Condition**

29. After receiving approval from the regulatory agencies, CSB took the steps necessary to satisfy all of the closing conditions for which it was responsible in the Merger Agreement.

30. In that regard, CSB engaged in lengthy negotiations to sell the CSB Investment Assets.

31. But before it sold its income producing assets, CSB sought assurances from Inland that Inland had satisfied all of its obligations under the Merger Agreement and that the Closing Date was imminent.

32. Therefore, on or about May 5, 2015, Mr. O'Donoghue and CSB's outside counsel engaged in a telephone call with Howard Jaffe, Inland's then-CEO and Inland's outside counsel, to seek assurances from Inland that it had satisfied all of its obligations under the Merger Agreement and that the Closing Date was imminent (the "Telephone Call").

33. During the Telephone Call, the parties again specifically discussed CSB's economic vulnerability once it concluded the sale of its CSB Investment Assets.

34. Mr. Jaffe acknowledged CSB's concerns regarding the sale of its assets, and reassured CSB that Inland had fully performed all of its obligations under the Merger Agreement according to its best efforts and directed CSB to immediately sell the CSB Investment Assets because Inland was prepared to imminently consummate the Merger.

35. Mr. Jaffe suggested that the Closing Date be set for May 12, 2015, but Mr. O'Donoghue told him that CSB needed some additional time to finalize the sale of the CSB Investment Assets.

6

36. As a result, Mr. O'Donoghue suggested that the Closing Date be May 15, 2015. Mr. Jaffe quickly agreed.

37. One day later, on May 6, 2015, CSB's counsel, Michael White, sent a letter to the Illinois Department of Financial and Professional Regulation Division of Banking. In the letter, Mr. White advised "that the [M]erger will be consummated on May 15, 2015."

38. In reliance on these events and on Inland's representations, CSB sold the CSB Investment Assets.

**D.     The FDIC Suspends Its Approval Of The Merger**

39. Upon information and belief, during the May 5 Telephone Call, Inland knew that it could not consummate the Merger on the Closing Date and, furthermore, would never consummate the Merger.

40. That is because prior to the Telephone Call, Mr. Jaffe knew, or had reason to know, that based on certain of Inland's actions, including upon information and belief, substantially increasing the risk profile of its lending practices without coordinating in advance with the FDIC, the FDIC either had suspended, or was going to imminently suspend, its approval of the Merger – an extraordinary and unusual step for the FDIC to take.

41. Upon information and belief, the FDIC had commenced an onsite examination of Inland's banking practices in early April 2015, which continued into early May 2015 and which Inland reasonably should have understood was a precursor to the FDIC imposing further conditions on Inland that would impede the Merger or make it impossible.

42. Indeed, upon information and belief, just three days after the Telephone Call, on May 8, 2015, the FDIC sent a formal letter to Inland's Board of Directors informing them that it had suspended its approval of the Merger (the "May 8 Letter").

7

43. Inland deliberately concealed the May 8 Letter from CSB until after CSB had divested itself from its CSB Investment Assets.

44. Upon information and belief, Inland knew or should have known before receipt of the May 8 Letter, and before the May 5 Telephone Call, that the FDIC was likely to suspend or revoke its approval of the Merger as a consequence of its month-long, onsite examination of Inland's banking practices.

45. Despite Inland's actual or constructive knowledge, Inland instructed CSB during the Telephone Call to sell the CSB Investment Assets.

46. During the approximately seven (7) days between the Telephone Call and CSB's sale of the CSB Investment Assets, Inland made no attempts to make CSB aware of the reasonable probability that the FDIC would suspend or revoke its prior approval of the Merger as a consequence of its onsite examination of Inland.

47. In fact, Inland did not inform CSB of the FDIC's May 8 Letter until the evening of May 12, 2014, by which time CSB had concluded the sale of the CSB Investment Assets in anticipation of closing the Merger.

48. Inland refused (and continues to refuse) to identify for CSB the specific cited reasons for the FDIC's issuance of its May 8 Letter, under a disingenuous claim of "confidentiality."

49. Upon information and belief, after Inland came to understand that it would not be permitted to enter into the Merger, Inland decided to exploit its contractual leverage over CSB by falsely misrepresenting its ability to close the Merger, and by deliberately concealing material information from CSB indicating that Inland would be unable to close the Merger.

E.  **Inland Attempts To Terminate The Merger Agreement**

50. Weeks after learning that the FDIC had suspended its approval, Inland initially informed CSB that it would still use its "Best Efforts" to revive regulatory approval for Inland to close the Merger, as Inland was required to do under the Merger Agreement.

51. Specifically, in a May 20, 2015 letter, Inland's attorney informed CSB:

> [T]he FDIC is suspending its approval of the Merger between Inland Bank and Trust and College Savings Bank. As such, Inland Bank and Trust is not permitted to take any action to consummate the referenced merger with CSB unless or until the FDIC provides written confirmation that the merger may proceed. Inland Bank and Trust continues to diligently pursue in good faith, and use its Best Efforts to obtain and/or satisfy all regulatory approvals and requirements necessary to consummate the Contemplated Transactions prior to the Termination Date.

52. Thus, Inland recognized in the May 20, 2015 letter that it was required to use its Best Efforts to diligently exercise its good faith to ensure that it would obtain approval from the FDIC.

53. Inland, however, did not use its Best Efforts to obtain such approval.

54. Upon information and belief, Inland exercised no good faith efforts to save the Merger and to cure its banking deficiencies that had caused the FDIC to issue the May 8 Letter, even though, upon information and belief (as further discussed below), such a cure was possible within Inland's reasonable capability.

55. In fact, less than two weeks later, Inland notified CSB that it was terminating the Merger Agreement.

56. Specifically, in a June 2, 2015 letter, Mr. Jaffe informed CSB that Inland was providing notice of termination of the Merger Agreement.

57. Mr. Jaffe did not claim that the basis for termination was the FDIC's decision to suspend regulatory approval of the Merger. Instead, Mr. Jaffe falsely claimed that CSB had

9

failed to comply with conditions in the Merger Agreement. Unsurprisingly, Mr. Jaffe failed to detail any facts to support his claim that CSB failed to comply with any condition.

58. Two days later, CSB's Chairman and Chief Executive Officer, Gilbert Johnson, responded to Mr. Jaffe's missive. In a June 4, 2015 letter, Mr. Johnson rejected Inland's purported termination as ineffective and demanded that Inland use its Best Efforts to obtain FDIC approval, as it was required to do under the Merger Agreement.

59. Inland failed to respond to the June 4 letter or provide any information to CSB regarding the FDIC's decision or Inland's efforts, if any, to obtain FDIC approval of the Merger.

F. **Only About Three Months Later, Inland Publicly States That It Could Obtain Regulatory Approval For A Different Bank Acquisition**

60. Merely a few months after it notified CSB that it was terminating the Merger Agreement, Inland professed to the public that it was in the market to acquire community banks.

61. On or about October 3, 2015, Daniel Goodwin, Inland's owner, announced through *Crain's Chicago Business*: "I'm not aware of any restriction or prohibition in Inland's ability to pursue acquisitions," adding that "[i]f an opportunity presented itself that was accretive enough . . . we would seriously consider it."

62. And on or about October 28, 2015, Mr. Goodwin reported to the same publication: "Inland Bank is back in the hunt to acquire community banks."

63. Thus, upon information and belief, only about three months after purporting to terminate the Merger Agreement with CSB, Inland cured whatever banking deficiencies had prompted the FDIC to suspend its approval of the Merger.

**G.    CSB Subsequently Enters Into A Merger Agreement
With NexBank SSB For A Substantially Lower Purchase Price**

64.    On or about December 1, 2015, CSB was acquired by NexBank SSB, a regional bank headquartered in Dallas, Texas ("NexBank").

65.    Based on the failed Merger with Inland, and the various actions that CSB undertook as conditions to the failed Merger – including in particular CSB's sale of its valuable CSB Investment Assets – the purchase price that CSB ultimately received from NexBank was substantially lower than the purchase price it should have received from Inland under the Merger Agreement: *i.e.*, amounting to a difference of approximately $5 million.

66.    In addition to other damages, CSB lost millions of dollars in investment income as a result of liquidating the CSB Investment Assets in anticipation of closing the Merger with Inland.

## COUNT I
## FRAUD

67.    All the foregoing paragraphs are incorporated herein by reference as if fully set forth.

68.    As more particularly set forth above, Inland intentionally and without justification perpetrated a fraud upon CSB.

69.    On May 5, 2015, Inland's CEO instructed CSB to immediately sell the CSB Investment Assets because Inland had satisfied all of its conditions under the Merger Agreement and Inland was prepared to imminently consummate the Merger.

70.    Inland's CEO's statement was false, misleading and constituted a material misrepresentation and omission to Plaintiff.

11

71. Inland's CEO made such statement knowing that it was false, or with a reckless disregard for the knowledge of its falsity and/or with reckless disregard for its truth.

72. Inland's false misrepresentations and material omissions were knowingly false when made and were made with the intent that CSB would reasonably rely thereon, which CSB did to its detriment.

73. Had CSB known the truth regarding said material misrepresentations, omissions and misconduct, CSB would not have sold the CSB Investment Assets, which caused CSB to lose substantial interest income on those Assets.

74. As a direct and proximate result of Inland's material misrepresentations, CSB incurred substantial damages due to the premature sale of the CSB Investment Assets, including but not limited to the interest income on the CSB Investment Assets, in an amount to be determined at trial, but not less than $7 million, plus interest.

75. The above described misconduct, misrepresentations and omissions are outrageous, willful, intentional, false, malicious, reckless, wanton and in bad faith, and done with the willful disregard for the rights and interests of CSB, for which an award of punitive damages is warranted.

## COUNT II
## BREACH OF CONTRACT

76. Plaintiff hereby repeats and realleges the foregoing paragraphs as if fully set forth herein.

77. The Merger Agreement is a valid and enforceable contract.

78. Inland breached its covenants, representations and obligations under the Merger Agreement, as set forth above, and by, *inter alia*, intentionally and willingly failing to diligently pursue in good faith and use its Best Efforts to obtain and/or satisfy all regulatory approvals and

requirements necessary to consummate the Merger Agreement, in violation of Sections 5.6, 8.1, and 8.5 of the Merger Agreement, among other provisions.

79. Inland further breached the Merger Agreement by intentionally and willfully taking actions which prevented the consummation of the Merger in violation of Section 7.5 of the Merger Agreement, among other provisions.

80. Inland further breached the Merger Agreement by intentionally and willfully failing to promptly inform CSB of the FDIC's decision to suspend approval of the Merger or for failing to provide any such information relating to that issue, in violation of Sections 7.1, 8.1 and 8.2 of the Merger Agreement, among other provisions.

81. Inland further breached the Merger Agreement by wrongfull, intentionally and willfully terminating the Merger Agreement, in violation of Section 11.1 of the Merger Agreement, among other provisions.

82. Inland's numerous breaches of the Agreement have caused CSB to suffer monetary damages in an amount to be determined at trial, but not less than $5 million, plus interest.

WHEREFORE, Plaintiff respectfully requests that:

(1) it be awarded damages, including punitive damages, on its First Count;

(2) it be awarded damages on its Second Count; and

(3) it be awarded such other and further relief as this Court deems appropriate.

Dated: December 23, 2015

By: */s/ William L. Charron*
William L. Charron
Eric M. Fishman (Pro Hac Vice pending)
PRYOR CASHMAN LLP
7 Times Square
New York, New York 10036
Telephone: (212) 421-4100
wcharron@pryorcashman.com
efishman@pryorcashman.com


Carrie A. Hall (6269884)
Zachary J. Watters (6310675)
MICHAEL BEST & FRIEDRICH LLP
180 North Stetson Avenue, Suite 2000
Chicago, Illinois 60601
Telephone: (312) 222-0800
cahall@michaelbest.com
zjwatters@michaelbest.com

*Attorneys for Plaintiff Brian J. O'Donoghue*