UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BRIAN J. O'DONOGHUE, as authorized representative, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| INLAND BANK AND TRUST, | ) ) |
| Defendant. | ) ) |

No. 15 C 11603

Judge Sara L. Ellis

## **OPINION AND ORDER**

Brian J. O'Donoghue, as an authorized representative of College Savings Bank ("CSB"), brings this suit against Inland Bank and Trust ("IBT"), alleging fraud and breach of contract arising out of the failed merger of the two banks in 2015. CSB contends that IBT breached the parties' contract (the "Merger Agreement") in four ways: (1) IBT did not use its best efforts to consummate the merger, as required by §§ 5.6, 8.1, and 8.5 of the Merger Agreement; (2) IBT prevented the merger, violating § 7.5; (3) IBT failed to promptly notify CSB of the Federal Deposit Insurance Corporation's ("FDIC") decision to suspend approval of the merger, violating §§ 7.1, 8.1, and 8.2; and (4) IBT wrongfully terminated the merger, violating § 11.1.

IBT moves to dismiss CSB's fraud claim in full, and CSB's breach of contract claim with respect to IBT's failure to use of its best efforts and promptly inform CSB of the FDIC's decision. The Court finds that CSB has adequately met Federal Rule of Civil Procedure 9(b)'s heightened pleading standard for fraud with respect to allegedly fraudulent statements made by IBT on a May 5, 2015 telephone call but not in a May 20, 2015 letter, and so allows CSB to proceed on its fraud claim with respect to the May 5 statements but not the May 20 statements. The Court dismisses CSB's breach of contract claim alleging violation of the "best efforts"

clause because the "best efforts" clause does not contain any of the objectivity or specificity that would render it enforceable under Illinois law. But because the Court can draw the reasonable inference that IBT did not promptly notify CSB of the FDIC's suspended approval and such failure would violate the Merger Agreement, CSB's breach of contract claim pertaining to the prompt notification clauses survives.

## BACKGROUND[1]

CSB was a New Jersey-based bank that specialized in certificates of deposit under college savings programs. NexBank SSB acquired CSB on or about December 1, 2015. Prior to this acquisition, CSB entered into the Merger Agreement with IBT on or about October 22, 2014, providing for IBT to acquire CSB. The merger was never consummated, however, resulting in this lawsuit.

The Merger Agreement included various terms and conditions that IBT had to meet prior to the consummation of the transaction. *See* Doc. 19-1 § 10.2 ("IBT shall have performed or complied with all covenants and obligations to be performed or complied with by them under the terms of this Agreement on or prior to the Closing Date"). Because IBT was subject to a 2012 FDIC consent order, IBT needed regulatory approval of the acquisition and so agreed to obtain such approval from the New Jersey Department of Banking and Insurance, the Illinois Department of Financial and Professional Regulation, and the FDIC as a precondition to closing. IBT also represented that as of October 22, 2014, there was "no reason why the granting of any

---

[1] The facts in the background section are taken from CSB's complaint and are presumed true for the purpose of resolving IBT's motion to dismiss. *See Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011); *Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO v. Exelon Corp.*, 495 F.3d 779, 782 (7th Cir. 2007). The Court also considers the Merger Agreement between the parties, which IBT has attached to its motion to dismiss and CSB references extensively and quotes from in its complaint. *See Hecker v. Deere & Co.*, 556 F.3d 575, 582–83 (7th Cir. 2009) (although a court normally cannot consider extrinsic evidence without converting a motion to dismiss into one for summary judgment, the court may consider documents referenced in the complaint and central to plaintiff's claims).

2

of the Regulatory approvals required to be obtained by [IBT] to consummate the Contemplated Transactions would be denied or unduly delayed" more than five months thereafter. *Id.* § 5.6. IBT further covenanted that it would use its best efforts to obtain the required approvals, agreeing to "diligently pursue in good faith, and use its Best Efforts to obtain and/or satisfy all regulatory approvals and requirements necessary to consummate the Contemplated Transactions." *Id.* § 8.1(b). Both IBT and CSB agreed to "exercise good faith and use [their] Best Efforts to satisfy the various covenants and conditions to Closing in [the Merger] Agreement, and to consummate the Contemplated Transactions hereby as promptly as possible." *Id.* § 8.5. The Merger Agreement defined "best efforts" as "the efforts that a prudent Person desirous of achieving a result would use in similar circumstances to ensure that such result is achieved as expeditiously as possible." *Id.* § 1.1(c). Additionally, IBT stated it would not "take any affirmative action, or fail to take any reasonable action within its control, the effect of which would be to materially impair, delay or otherwise prevent the consummation of the Contemplated Transaction." *Id.* § 7.5(b).

IBT also agreed to keep CSB informed of the status of the intended acquisition. Thus, the Merger Agreement included a "prompt notification" clause:

> Between the Agreement Date and the Closing Date, [IBT] shall promptly notify CSB in writing . . . if [IBT] becomes aware of the occurrence after the Agreement Date of any fact or condition that would (except as expressly contemplated by this Agreement) cause or constitute a Breach of any [IBT] representation or warranty had such representation or warranty been made as of the time of occurrence or discovery of such fact or condition. During the same period, [IBT] will promptly notify CSB of the occurrence of any Breach of any covenant of [IBT] or CSB in this Agreement or of the occurrence of any event that might reasonably be expected to make the satisfaction of the conditions in Article 10 impossible or unlikely.

*Id.* § 7.1.[2] IBT also agreed in § 8.1(b) "promptly to advise CSB and its counsel of, and share with them, any material communication received by [IBT] or its counsel from any Regulatory Authorities with respect to the non-confidential portions of such filings." *Id.* § 8.1(b).

CSB had to satisfy several conditions prior to the closing of the merger as well, principally, to sell all of its investment assets, comprised mainly of federally guaranteed student loans and mortgage-backed debt securities. Because the sale of these assets would put CSB in a significantly disadvantaged economic position, the sale was to take place only after IBT had satisfied its obligations, with the closing then occurring no more than two days after the sale of CSB's assets.

Upon execution of the Merger Agreement, IBT set out to obtain the required regulatory approvals. The FDIC approved the merger on December 23, 2014, and IBT obtained the other required approvals thereafter. CSB then sought to comply with its obligations under the Merger Agreement, including selling its investment assets. Before doing so, it again sought assurances from IBT that IBT had satisfied all of its obligations and that a closing date was imminent. IBT made such assurances during a May 5, 2015 telephone call, instructing CSB to sell its investment assets. Although IBT suggested a closing date of May 12, CSB asked for additional time to finalize the sale, with the parties agreeing to a closing date of May 15. CSB then advised the Illinois Department of Financial and Professional Regulation Division of Banking on May 6 of the closing date and set out to sell its assets.

On May 8, however, IBT received a formal letter from the FDIC stating that the FDIC had suspended its approval of the merger. Although the letter was sent on May 8, IBT had apparently known of the FDIC's intention to take this action earlier, because the FDIC had

---

[2] Article 10 includes conditions precedent to CSB's obligation to consummate the transaction, including that all required approvals have been obtained from the applicable regulatory authorities.

4

commenced an onsite examination of IBT's banking practices in early April 2015 that continued into May. But IBT did not notify CSB of the likelihood of the suspension on the May 5 phone call. It also delayed in informing CSB of the FDIC's formal suspension letter, only relaying that information on May 12, by which time CSB had already sold its investment assets.

Despite losing the FDIC's regulatory approval, meaning the transaction could not close on May 15, IBT indicated in a May 20 letter that it "continue[d] to diligently pursue in good faith, and use its Best Efforts to obtain and/or satisfy all regulatory approvals and requirements necessary to consummate the Contemplated Transactions prior to the Termination Date." Doc. 1 ¶ 51. Then, on June 2, IBT informed CSB it was terminating the Merger Agreement, claiming CSB had not complied with the Merger Agreement's conditions. CSB rejected the termination on June 4, demanding that IBT use its best efforts to obtain FDIC approval. IBT did not respond, precipitating this lawsuit.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also be facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

ANALYSIS

I. **Fraud Claim**

To state a claim for fraud, CSB must allege that (1) IBT made a false statement or omission of material fact, (2) IBT knew of or believed in its falsity, (3) IBT intended to induce CSB to act, (4) CSB acted in reliance on the truth of IBT's statement, and (5) damages resulted from CSB's reliance. *Weidner v. Karlin*, 932 N.E.2d 602, 605, 402 Ill. App. 3d 1084, 342 Ill. Dec. 475 (2010). Additionally, to the extent CSB claims fraudulent concealment, it must allege that IBT had a duty to disclose the omitted fact to it. *Id.*; *see also Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 613 (7th Cir. 2013). A heightened pleading standard applies to fraud claims: "Fed. R. Civ. P. 9(b) requires the plaintiff to state 'with particularity' any 'circumstances constituting fraud.' Although states of mind may be pleaded generally, the 'circumstances' must be pleaded in detail. This means the who, what, when, where, and how." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). IBT argues that CSB has not met this heightened standard, claiming CSB has neither alleged a false statement nor that IBT had sufficient intent to induce CSB to act on any statements. CSB responds that it has adequately asserted fraudulent misrepresentations and omissions by IBT and that IBT made such misrepresentations to induce CSB's reliance. Because IBT does not challenge whether CSB has adequately alleged a fraudulent concealment claim, the Court will not address such a claim at this stage, deferring consideration of issues concerning omissions to summary judgment.[3] Instead, it will only

---

[3] To the extent that CSB addresses omissions in its response and IBT responds to those in its reply, the Court does not address them here, because the arguments are undeveloped and the Court will not research the law and construct the parties' arguments for them as to why CSB's fraudulent concealment claims should or should not survive. *See Economy Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d

6

consider the two issues raised by IBT in its motion to dismiss: whether CSB has adequately met Rule 9(b) in alleging (1) false statements and (2) IBT's intent to induce CSB to act with respect to those false statements.

According to CSB's complaint, IBT materially misrepresented that it had fully performed all of its obligations under the Merger Agreement and that it was prepared to imminently consummate the merger on the May 5, 2015 phone call. Doc. 1 ¶ 69. Additionally, in its response to IBT's motion to dismiss, CSB identifies another alleged misrepresentation, made in IBT's May 20, 2015 letter to CSB, that IBT "would apply its contractually-mandated 'best efforts' to cure its regulatory deficiency perceived by the FDIC."[4] Doc. 25 at 9; *see also* Doc. 1 ¶¶ 50–52.

A. **IBT's May 5, 2015 Statements**

CSB alleges that, in its May 5, 2015 phone call with IBT, IBT represented that it "had fully performed all of its obligations under the Merger Agreement according to its best efforts" and "was prepared to imminently consummate the Merger." Doc. 1 ¶ 34; *see also id.* ¶ 69 ("Inland had satisfied all of its conditions under the Merger Agreement and Inland was prepared to imminently consummate the Merger."). IBT contends that these statements were true at the

---

718, 721 (7th Cir. 2008) ("It is not the court's responsibility to research the law and construct the parties' arguments for them.").

[4] Although CSB did not identify this as a fraudulent statement in the complaint itself and appears to acknowledge this in its response to the motion to dismiss, stating that to the extent the Court concludes that the "best efforts" clause is unenforceable, then IBT's misrepresentation about its intention to abide by the "best efforts" clause would be a further actionable fraudulent misrepresentation, the Court addresses it here because the statement is included in the complaint and IBT had an opportunity to respond in its reply. In its response, CSB also appears to argue in a footnote that IBT made an additional misstatement in October 2014 by representing in the Merger Agreement that it knew of no reason why the granting of any regulatory approval would be denied. *See* Doc. 25 at 9 n.3. But the Court will not address this alleged misrepresentation, which is noted only in an undeveloped footnote. *See Harmon v. Gordon*, 712 F.3d 1044, 1053 (7th Cir. 2013) ("[A] party can waive an argument by presenting it only in an undeveloped footnote.").

7

time they were made, meaning that CSB cannot proceed on its fraud claim with respect to these statements.

Although IBT argues that it still retained FDIC approval at the time of the May 5 call, only receiving the FDIC's formal notice of suspension of approval of the merger on May 8, this does not foreclose the possibility, as pleaded in the complaint, that IBT knew that the FDIC had suspended its approval (at least informally) as of the May 5 call. Similarly, although IBT did suggest an earlier closing date than ultimately agreed to by the parties on the May 5 call, this does not conclusively demonstrate that the statements are not actionable. Moreover, all that CSB must plead at this stage is the who, what, when, and where surrounding the alleged misrepresentation; it need not demonstrate that the alleged statements were actually false. *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir. 1992). CSB has plausibly alleged, based on the surrounding circumstances, that the statements that IBT had complied with all conditions precedent to closing and was ready to consummate the merger, as made on that May 5 call, were false. Discovery may prove otherwise, but at this point the Court must take CSB's allegations as true and cannot dismiss the fraud claim based on IBT's bare contention that the statements were true. *See Freedom Mortg. Corp. v. Burnham Mortg., Inc.*, 720 F. Supp. 2d 978, 989 (N.D. Ill. 2010) ("At the motion to dismiss stage, Rule 9(b) requires only that the plaintiff identify the alleged misrepresentations, not actually prove that the statement was false."). The Court also will not resolve issues concerning whether IBT was required to maintain the confidentiality of any FDIC examinations taking place in April or May 2015, as such questions involve the factual circumstances surrounding the examination, interpretation of the Merger Agreement, and statutory interpretation. *See* Doc. 19-1 § 8.1(b) (providing that IBT would promptly advise CSB and share "any material communication

received by [IBT] or its counsel from any Regulatory Authorities with respect to the non-confidential portions" of regulatory filings). Further, this argument was raised only in reply and is thus waived. *See Dexia Credit Local v. Rogan*, 629 F.3d 612, 625 (7th Cir. 2010) ("[A]rguments raised for the first time in a reply brief are waived.").

Additionally, even though CSB has based its allegations in part "on information and belief," this is not fatal. CSB "provide[s] the grounds for [its] suspicions" and provides a basis for IBT to effectively respond to the statement, particularly considering the informational asymmetries at this stage of the proceeding. *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 442–43 (7th Cir. 2011) (plaintiff may proceed on fraud allegations based on information and belief "so long as (1) the facts constituting the fraud are not accessible to the plaintiff and (2) the plaintiff provides 'the grounds for his suspicions'" (quoting *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 924 (7th Cir. 1992))); *see also Pilot v. Focus Retail Prop. I, LLC*, No. 09 C 6879, 2010 WL 2836710, at *4 (N.D. Ill. July 19, 2010) (Rule 9(b) particularity requirement "is subject to a lower threshold of certainty" at motion to dismiss stage "[b]ecause the facts supporting the allegation are still within the defendant's realm of knowledge" and so the plaintiff need only identify the alleged misrepresentation and not prove its falsity).

IBT also argues that CSB has not sufficiently alleged that IBT made the statements with the intent to induce CSB to sell its assets without consummating the merger. But intent may be pleaded generally, and CSB has adequately alleged that IBT delayed in informing CSB of the FDIC's suspension of approval in an attempt to induce CSB to sell its assets. Although IBT contends that it had no reason to waste its own time and expense in pursuing a merger if it knew it would never be consummated, CSB at least alleges that IBT "decided to exploit its contractual

leverage over CSB by falsely misrepresenting its ability to close the Merger." Doc. 1 ¶ 49. The Court does not find such allegations so implausible or tenuous as to warrant dismissal of these fraud claims at this stage. *Cf. Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 841 (7th Cir. 2007) (in fraud case against accountant, scienter was not properly alleged where the plaintiff only alleged accountant's interest in generating fees and there was a tenuous relationship between the desire for continued fees and the intention to induce the plaintiff not to seek rescission of asset purchase agreement). Thus, CSB may proceed to discovery on its fraud claims based on the May 5 statements.

### B. IBT's May 20, 2015 Letter

In its response to IBT's motion to dismiss, CSB identifies an additional allegedly fraudulent statement made by IBT in a May 20, 2015 letter: that IBT "continues to diligently pursue in good faith, and use its Best Efforts to obtain and/or satisfy all regulatory approvals and requirements necessary to consummate the Contemplated Transactions." Doc. 1 ¶ 51; Doc. 25 at 10. CSB cannot proceed on a fraud claim based on this alleged misrepresentation, however. CSB does not allege that IBT intended for the representations in the May 20 letter to induce CSB to act in any way, nor, for that matter, that CSB acted or relied on the letter.[5] *See Tricontinental Indus., Ltd.*, 475 F.3d at 841 (finding plaintiff had not adequately alleged that statements were made with intent to induce defendant not to seek rescission). Therefore, the Court dismisses CSB's claim for fraud based on the May 20, 2015 letter.

---

[5] Additionally, the Court notes that, to the extent IBT's statements in the May 20 letter address IBT's future intentions, these statements would not be actionable, for only statements of present or preexisting facts and not statements of future intent or conduct constitute fraud under Illinois law. *See Cohn v. Guaranteed Rate, Inc.*, No. 14 C 9369, 2016 WL 147884, at *3 (N.D. Ill. Jan. 13, 2016); *Ault v. C.C. Servs., Inc.*, 597 N.E.2d 720, 722, 232 Ill. App. 3d 269, 173 Ill. Dec. 746 (1992).

## II. Breach of Contract Claim

### A. Best Efforts Clauses

The Merger Agreement provides that IBT will use its best efforts to consummate the merger. Specifically, § 8.1(b) states: "[IBT] shall diligently pursue in good faith, and use its Best Efforts to obtain and/or satisfy all regulatory approvals and requirements necessary to consummate the Contemplated Transactions." Doc. 19-1 § 8.1(b). Section 8.5 further states: "[IBT] . . . agrees to exercise good faith and use its Best Efforts to satisfy the various covenants and conditions to Closing in this Agreement, and to consummate the Contemplated Transactions hereby as promptly as possible." *Id.* § 8.5.[6] The Merger Agreement defines "best efforts" as "the efforts that a prudent Person desirous of achieving a result would use in similar circumstances to ensure that such result is achieved as expeditiously as possible." *Id.* § 1.1(c).

IBT argues that CSB's breach of contract claim cannot be based on the Merger Agreement's "best efforts" clauses because those clauses are unenforceable, and, even if enforceable, CSB has not alleged that IBT did not perform its contractual duties. Generally, Illinois courts find "best efforts" clauses unenforceable because of their vagueness. *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1441 (7th Cir. 1992) ("[A] statement that [party] would 'do [its] very best to make this project a success' is merely a vague expression of goodwill; it is not an enforceable contractual promise." (second alteration in original)). However, both parties agree, citing *Heritage Remediation/Engineering, Inc. v. Wendnagel*, that Illinois courts may enforce a "best efforts" clause "as long as there are objective criteria present

---

[6] In its complaint, CSB appears to include § 5.6 of the Merger Agreement as a "best efforts" clause as well. Section 5.6, however, is a representation that, at the time of entering into the Merger Agreement, IBT was not aware of any reason why regulatory approval would be delayed and that IBT had sufficient funds to satisfy its obligations. The phrase "best efforts" does not appear explicitly in this clause, nor does CSB allege that it is implied. Therefore, because the Court does not see a basis for how this clause ties into the other "best efforts" clauses alleged to have been breached, the Court will focus only on §§ 8.1(b) and 8.5, to which the argument raised by IBT directly applies.

11

by which to judge whether the proper effort has indeed been made." No. 80 C 413, 1989 WL 153373, at *6 (N.D. Ill. Nov. 9, 1989). CSB argues that the "best efforts" clauses are clear and understandable because the Merger Agreement was negotiated between sophisticated and represented parties and IBT even acknowledged its obligations under the best efforts clauses on May 20, 2015, representing that it would continue to use its best efforts to satisfy all requirements necessary for closing.

In determining the enforceability of "best efforts" clauses, Illinois courts focus on whether "objective criteria" exists against which to measure a party's compliance. *See Clever Ideas, Inc. v. Citicorp Diners Club, Inc.*, No. 02 C 5096, 2003 WL 21982141, at *17 (N.D. Ill. Aug. 20, 2003) (finding "best efforts" clause enforceable where "[t]here is evidence that the parties agreed to at least some specificity concerning Clever Ideas' obligations"); *Heritage*, 1989 WL 153373, at *6 (contract required plaintiff to use "best efforts" to remove as much lead and xylene as possible, with weight estimates and target levels provided). Courts have also enforced "best efforts" clauses where the clause represents "an express articulation of that otherwise implied obligation" to use "good faith, reasonable efforts to promote" the other party's product, such as in an exclusive licensing or marketing relationship. *Gentieu v. Tony Stone Images/Chicago, Inc.*, 255 F. Supp. 2d 838, 867 (N.D. Ill. 2003). On the other hand, cases holding "best efforts" clauses unenforceable have focused on the fact that, for example, a contract specified no criteria for a distributor's obligation to sell products aside from using his best efforts, such as specifying duration, price, area, product, quotas, or quantity. *Kraftco Corp. v. Kolbus*, 274 N.E.2d 153, 156, 1 Ill. App. 3d 635 (1971); *see also Hodges v. Pub. Bldg. Comm'n of Chicago*, No. 93-C-4328, 1994 WL 716300, at *15 (N.D. Ill. 1994) (agreement to

use "'best efforts . . . to construct and/or complete the Buildings and Facilities . . . at the earliest possible date'… is too indefinite and uncertain by itself to form grounds for liability").

Here, the best efforts clauses do not provide any objective criteria by which to measure IBT's performance; instead, as in *Beraha*, it is essentially "a vague expression of goodwill" providing the Court with no measurable standard against which to determine whether IBT actually put forth its "best efforts." 956 F.2d at 1441; *see also Pennington v. Travelex Currency Servs., Inc.*, 114 F. Supp. 3d 697, 701–02 (N.D. Ill. 2015) (finding that promise of "excellent exchange rate" was unenforceable because "the contract identifies no objective criteria to determine the level of 'excellence' of the rate charged"). Without any objective criteria involved in the definition of "best efforts," such as specific dates IBT had to meet, instead only referring to the efforts a "prudent Person desirous of achieving a result would use in similar circumstances to ensure that such result is achieved as expeditiously as possible," the Court finds the best efforts clauses unenforceable. *See Beraha*, 956 F.2d at 1441; *Hodges*, 1994 WL 716300, at *15. Thus, the Court dismisses CSB's breach of contract claim premised on violation of the best efforts clauses.

### B. Prompt Notification of FDIC Decision to Suspend Approval of Merger

CSB also alleges that IBT failed to uphold its agreement to promptly notify CSB of the FDIC's suspension of the approval of the merger, violating §§ 7.1, 8.1(b), and 8.2 of the Merger Agreement. IBT argues, however, that it did not violate these sections, as it promptly informed CSB of the FDIC letter and the FDIC letter did not qualify as a communication or occurrence that would make closing unlikely because the letter did not indicate the FDIC had permanently revoked its approval of the parties' merger. The parties differ on the definition of "prompt," which the Merger Agreement does not define. IBT emphasizes that it notified CSB of the

suspension of approval within two business days, while CSB argues that it took four actual days for IBT to notify them. The parties also disagree as to whether the FDIC's letter even affected IBT's obligations under §§ 7.1, 8.1(b), and 8.2. But these are not questions regarding the sufficiency of the complaint; rather, they concern the merits, which are not to be considered by the Court at this stage. Drawing all reasonable inferences in CSB's favor, this Court could infer that IBT did not "promptly" notify CSB of the FDIC's letter, which it plausibly had to do under §§ 7.1, 8.1(b), and 8.2, and that, as a result, such failure to notify breached these sections of the Merger Agreement. The Court thus denies this aspect of IBT's motion to dismiss CSB's breach of contract claim.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part IBT's motion to dismiss [19]. The Court dismisses CSB's fraud claim to the extent it is based on IBT's May 20, 2015 letter and CSB's breach of contract claim premised on violation of the best efforts clauses without prejudice.

Dated: September 7, 2016

SARA L. ELLIS
United States District Judge