UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BRIAN J. O'DONOGHUE, as authorized representative, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) No. 15 C 11603 ) ) Judge Sara L. Ellis |
| INLAND BANK AND TRUST, LAWRENCE AARON, MATTHEW FIASCONE, NICHOLAS HELMER, HOWARD A. JAFFE, HARRY L. LUKENS, JR., JOEL SIMMONS, and PAUL J. WHEELER, | ) ) ) ) ) ) |
| Defendants. | ) |

## OPINION AND ORDER

Brian J. O'Donoghue, as an authorized representative of College Savings Bank ("CSB"), brings this suit against Inland Bank and Trust ("IBT"), and IBT's directors, Lawrence Aaron, Matthew Fiascone, Nicholas Helmer, Howard A. Jaffe, Harry L. Lukens, Jr., Joel Simmons, and Paul Wheeler (collectively, the "Directors"). After the close of fact discovery, O'Donoghue filed a first amended complaint, alleging that IBT and the Directors committed fraud and IBT breached its contract with CSB in connection with the failed merger of the two banks in 2015.[1]

IBT and the Directors move to dismiss the fraud claims in full, and IBT also seeks to dismiss CSB's breach of contract claim with respect to IBT's failure to diligently pursue in good

---

[1] CSB filed the first amended complaint under seal along with a redacted copy. The parties have also filed their briefs in connection with the pending motion to dismiss under seal, providing redacted copies on the docket as well. "Documents that affect the disposition of federal litigation are presumptively open to public view, even if the litigants strongly prefer secrecy, unless a statute, rule, or privilege justifies confidentiality." *In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010). The Court has relied on the information filed under seal in its decision here, including that information in this Opinion where appropriate. As such, the filings under seal should also enter the public domain, unless the parties make a showing that continued confidentiality is justified. The Court will allow the parties to file a statement regarding the propriety of maintaining these documents under seal.

faith all regulatory approvals and requirements necessary to consummate the parties' merger agreement as required by Section 5.6 of that agreement. The Court finds that CSB has sufficiently pleaded the fraudulent inducement claims against IBT and the Directors, except that those claims may not proceed to the extent they are based on the representation made in the Merger Agreement concerning regulatory approvals or Jaffe's statements contained in ¶ 31 of the first amended complaint. CSB's fraud claim against IBT may also proceed. But the Court dismisses CSB's breach of contract claim premised on the regulatory approval clause because CSB cannot establish that IBT breached that clause.

## BACKGROUND[2]

CSB was a New Jersey-based bank that specialized in certificates of deposit under college savings programs. NexBank SSB acquired CSB on or about December 1, 2015. Prior to this acquisition, CSB entered into a contract with IBT (the "Merger Agreement") on or about October 22, 2014, providing for IBT to acquire CSB. The Directors approved of the acquisition of CSB by Inland on or about July 28, 2014. The merger was never consummated, however, resulting in this lawsuit.

Jaffe executed the Merger Agreement on IBT's behalf as its then-CEO.[3] The Merger Agreement included various terms and conditions that IBT had to meet prior to the consummation of the transaction. *See* Doc. 61-1 § 10.2 ("IBT shall have performed or complied

---

[2] The facts in the background section are taken from CSB's first amended complaint and are presumed true for the purpose of resolving IBT and the Directors' motion to dismiss. *See Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011); *Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO v. Exelon Corp.*, 495 F.3d 779, 782 (7th Cir. 2007). The Court also considers the Merger Agreement between the parties and the Federal Deposit Insurance Corporation ("FDIC") Interagency Guidance on Leveraged Lending, which IBT and the Directors have attached to their motion to dismiss and CSB references extensively and quotes in its first amended complaint. *See Hecker v. Deere & Co.*, 556 F.3d 575, 582–83 (7th Cir. 2009) (although a court normally cannot consider extrinsic evidence without converting a motion to dismiss into one for summary judgment, the court may consider documents referenced in the complaint and central to plaintiff's claims).
[3] Jaffe also served as the Chairman of IBT's Board of Directors.

with all covenants and obligations to be performed or complied with by them under the terms of this Agreement on or prior to the Closing Date"). Because IBT was subject to a 2012 FDIC consent order, IBT needed regulatory approval of the acquisition and so agreed to obtain that approval from the New Jersey Department of Banking and Insurance, the Illinois Department of Financial and Professional Regulation, and the FDIC as a precondition to closing. IBT also represented that as of October 22, 2014, there was "no reason why the granting of any of the Regulatory approvals required to be obtained by [IBT] to consummate the Contemplated Transactions would be denied or unduly delayed" more than five months thereafter. *Id.* § 5.6. IBT further covenanted that it would use its best efforts to obtain the required approvals, agreeing to "diligently pursue in good faith, and use its Best Efforts to obtain and/or satisfy all regulatory approvals and requirements necessary to consummate the Contemplated Transactions." *Id.* § 8.1(b). Both IBT and CSB agreed to "exercise good faith and use [their] Best Efforts to satisfy the various covenants and conditions to Closing in [the Merger] Agreement, and to consummate the Contemplated Transactions hereby as promptly as possible." *Id.* § 8.5. The Merger Agreement defined "best efforts" as "the efforts that a prudent Person desirous of achieving a result would use in similar circumstances to ensure that such result is achieved as expeditiously as possible." *Id.* § 1.1(c). Additionally, IBT stated it would not "take any affirmative action, or fail to take any reasonable action within its control, the effect of which would be to materially impair, delay or otherwise prevent the consummation of the Contemplated Transaction." *Id.* § 7.5(b).

IBT also agreed to keep CSB informed of the status of the intended acquisition. Thus, the Merger Agreement included a "prompt notification" clause:

> Between the Agreement Date and the Closing Date, [IBT] shall promptly notify CSB in writing . . . if [IBT] becomes aware of the

3

> occurrence after the Agreement Date of any fact or condition that would (except as expressly contemplated by this Agreement) cause or constitute a Breach of any [IBT] representation or warranty had such representation or warranty been made as of the time of occurrence or discovery of such fact or condition. During the same period, [IBT] will promptly notify CSB of the occurrence of any Breach of any covenant of [IBT] or CSB in this Agreement or of the occurrence of any event that might reasonably be expected to make the satisfaction of the conditions in Article 10 impossible or unlikely.

*Id.* § 7.1.[4] Under § 7.2, IBT indicated that none of the information it provided to CSB or any regulatory agency would, at the time of filing, "be false or misleading with respect to any material fact, or omit to state any material fact necessary in order to make the statements therein not misleading." *Id.* § 7.2. IBT also agreed not to "take any affirmative action, or fail to take any reasonable action within its control, the effect of which would be to materially impair, delay or otherwise prevent the consummation of the Contemplated Transactions." *Id.* § 7.5(b). In § 8.1(b), IBT agreed "promptly to advise CSB and its counsel of, and share with them, any material communication received by [IBT] or its counsel from any Regulatory Authorities with respect to the non-confidential portions of such filings." *Id.* § 8.1(b).

CSB had to satisfy several conditions prior to the closing of the merger as well, principally, to sell all of its investment assets, comprised mainly of federally guaranteed student loans and mortgage-backed debt securities. Because the sale of these assets would put CSB in a significantly disadvantaged economic position, the sale was to take place only after IBT had satisfied its obligations, with the closing then occurring no more than two days after the sale of CSB's assets.

In connection with the negotiation of the Merger Agreement and thereafter, IBT orally represented to CSB that it knew of no reason why the relevant regulatory authorities would not

---

[4] Article 10 includes conditions precedent to CSB's obligation to consummate the transaction, including that all required approvals have been obtained from the applicable regulatory authorities.

approve the merger. For example, Jaffe repeatedly told CSB President Gilbert Johnson that Jaffe had "an outstanding relationship with the regulators, that the regulators believed that Inland had a clean and sound balance sheet, and that there were no reasons why the regulators would disapprove of the merger." Doc. 49 ¶ 31. But, according to CSB, at the time IBT negotiated and consummated the Merger Agreement, it knew its actions in expanding IBT's leveraged loan portfolio threatened the FDIC's approval of the merger. IBT and its Directors had begun purchasing high-risk leveraged lending participations in 2013.[5] The FDIC and other federal agencies issued guidance on leveraged lending in March 2013 (the "Interagency Guidance"). The Interagency Guidance noted that community banks involved in leveraged lending activities "should discuss with their primary regulator the implementation of cost-effective controls appropriate for the complexity of their exposures and activities." Doc. 61-2 at 21. The Interagency Guidance also states that "[a] lack of robust risk management processes and controls at a financial institution with significant leveraged lending activities could contribute to supervisory findings that the financial institution is engaged in unsafe-and-unsound banking practices." *Id.* The Directors, as well as Deborah Bartelt, IBT's Senior Vice President of Regulatory Compliance Management, read and understood the Interagency Guidance but IBT did not contact the FDIC to discuss implementation of proper risk controls when it began purchasing leveraged lending participations. On or around September 15, 2014, the Directors voted to allow IBT to purchase an increased number of leveraged lending participations, increasing the limit to 200% of risk weighted capital without a full presentation of the loans IBT intended to purchase. IBT also amended its loan policy to allow it to approve loans up to $7

---

[5] Leveraged loans are extended to companies or individuals with considerable debt, carrying with them higher interest rates and also higher rates of return to the lender. IBT purchased leveraged lending participations, which were interests in leveraged loans originated and sold by third parties, meaning that IBT did not do the original due diligence on the loan or have a relationship with the borrower.

5

million without requiring Directors Loan Committee approval, lessening oversight and increasing the speed with which large leveraged loans could be approved. These actions led Inland's senior compliance officer to send Jaffe an email on October 14, 2014 expressing concern about IBT's growth goals and the potential that "examiners [would] see . . . excessive growth funded by volatile, noncore sources." Doc. 50 ¶ 58. He therefore recommended that IBT stop pursuing leveraged loan participations, noting that "[t]hey are not relationship based and do not add value to the overall company." *Id.* Jaffe also received warnings from two principals of Sandler O'Neill, an investment banking firm, that although leveraged loans were lucrative, regulators disapproved of them as an asset class. But IBT continued increasing these loan participations, with its leveraged loan portfolio growing 611% in the twelve-month period ending March 31, 2015.

Upon execution of the Merger Agreement, IBT set out to obtain the required regulatory approvals. In its applications, IBT made no mention of the growth of its leveraged loan portfolio. The FDIC approved the merger on December 23, 2014, and IBT obtained the other required approvals thereafter. CSB then sought to comply with its obligations under the Merger Agreement, including by selling its investment assets. Before doing so, it again sought assurances from IBT that IBT had satisfied all of its obligations and that a closing date was imminent. IBT made such assurances during a May 5, 2015 telephone call, instructing CSB to sell its investment assets. Although IBT suggested a closing date of May 12, CSB asked for additional time to finalize the sale, with the parties agreeing to a closing date of May 15. IBT then advised the Illinois Department of Financial and Professional Regulation Division of Banking on May 6 of the closing date.

On May 8, however, IBT received a formal letter from the FDIC stating that the FDIC had suspended its approval of the merger. Although the letter was sent on May 8, IBT had apparently known of the FDIC's intention to take this action earlier, because the FDIC had commenced an onsite examination of IBT's banking practices in early April 2015 that continued into May. During this examination, the FDIC regulators spoke daily with IBT employees about IBT's leveraged loan portfolio, expressing concerns to senior management. As of April 20, 2015, IBT's senior compliance officer understood that the FDIC examiners had concerns concerning IBT's leveraged loan portfolio and how IBT would use the funds it would gain from CSB if the merger went through. IBT senior management also inquired of the FDIC examiner in charge at least twice whether the exam's findings would impact the merger's regulatory approval, with the examiner in charge indicating "it very well could." *Id.* ¶ 80. The examiner in charge referred IBT senior management to the FDIC's assistant regional director, but senior management did not follow up with the assistant regional director. The FDIC ultimately concluded that the growth of IBT's leveraged loan portfolio was "imprudent," especially given the lack of sufficient leveraged lending policies and risk management practices. *Id.* ¶ 64. On May 7, the FDIC examiner in charge informed Bartelt that IBT would be downgraded as a result of the exam findings and that the CSB merger would be affected as a result. The next day, the FDIC assistant regional director informed Jaffe that the FDIC was indefinitely suspending the merger, formalized in a letter sent to IBT's board of directors later that day.

Despite all this, IBT did not notify CSB of the likelihood of suspension on the May 5 phone call. And it also delayed in informing CSB of the FDIC's formal suspension letter, only relaying that information to CSB on May 12, by which time CSB had already sold its investment assets. CSB, however, had learned of the suspension by that point from an agent of the New

7

Jersey Department of Banking and Insurance. IBT also refused to inform CSB of the reason for the FDIC's issuance of the May 8 letter.

Despite losing the FDIC's regulatory approval, meaning the transaction could not close on May 15, IBT indicated in a May 20 letter that it "continue[d] to diligently pursue in good faith, and use its Best Efforts to obtain and/or satisfy all regulatory approvals and requirements necessary to consummate the Contemplated Transactions prior to the Termination Date." *Id.* ¶ 102. But the FDIC repeatedly told Jaffe that approval would not be forthcoming. Instead of notifying CSB of the FDIC's final decision, on June 2, IBT signed a waiver allowing CSB to shop itself to others and then also informed CSB it was terminating the Merger Agreement, claiming CSB had not complied with the Merger Agreement's conditions. CSB rejected the termination on June 4, demanding that IBT use its best efforts to obtain FDIC approval. IBT did not respond, precipitating this lawsuit.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also be facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads

8

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ANALYSIS

I.   **Fraud Claims (Counts I–III)**

In the first amended complaint, CSB brings fraudulent inducement and fraud claims against IBT and the Directors. For these claims, CSB must allege that (1) IBT and the Directors made a false statement or omission of material fact, (2) IBT and the Directors knew of or believed in its falsity, (3) IBT and the Directors intended to induce CSB to act, (4) CSB acted in reliance on the truth of IBT's and the Directors' statement, and (5) damages resulted from CSB's reliance. *Weidner v. Karlin*, 932 N.E.2d 602, 605, 402 Ill. App. 3d 1084, 342 Ill. Dec. 475 (2010). Additionally, to the extent CSB claims fraudulent concealment, it must allege that IBT and the Directors had a duty to disclose the omitted fact to it. *Id.*; *see also Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 613 (7th Cir. 2013). A heightened pleading standard applies to fraud claims: "Fed. R. Civ. P. 9(b) requires the plaintiff to state 'with particularity' any 'circumstances constituting fraud.' Although states of mind may be pleaded generally, the 'circumstances' must be pleaded in detail. This means the who, what, when, where, and how." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).

IBT and the Directors argue that CSB's fraud claims fail for several reasons. First, they contend that CSB has not pleaded the fraudulent inducement claim against the Directors with the requisite specificity and that, as to Jaffe, any alleged statements are non-actionable puffery and opinion statements. Next, IBT contends that CSB has not alleged any actionable misrepresentations to support its fraudulent inducement claim against IBT and that CSB's repleaded allegations do not support its fraud claim. Finally, IBT and the Directors argue that to

9

the extent CSB relies on fraudulent concealment, CSB has not adequately alleged that IBT or any of the Directors had a duty to disclose the alleged omissions to CSB. The Court addresses these arguments in turn.

### A. Fraudulent Inducement against the Directors (Count II)

#### 1. Group Pleading

The Directors argue that CSB has improperly lumped its claims against them together, failing to properly specify which individual Director made which allegedly fraudulent misrepresentation and instead seeking to hold them collectively liable for the actions of IBT or other officers or directors. Indeed, Jaffe is the only Director specifically mentioned in the first amended complaint, with other actions allegedly taken together by the Directors as a whole. Typically, such group pleading does not satisfy Rule 9(b)'s specificity requirement. *See Rocha v. Rudd*, 826 F.3d 905, 911 (7th Cir. 2016) (rejecting fraud claim where plaintiff did not "provide fair notice to each individual Defendant concerning the nature of his or her alleged participation in the fraud"); *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 778 (7th Cir. 1994) ("[I]n a case involving multiple defendants, the complaint should inform each defendant of the nature of his alleged participation in the fraud." (internal quotation marks omitted) (citation omitted)); *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990) (finding complaint failed to meet Rule 9(b) where "the complaint lumps all the defendants together and does not specify who was involved in what activity").

But CSB responds that it has sufficiently laid out each Directors' participation in the fraud, alleging that the Directors acted together in approving the Merger Agreement, assisting in the perpetration of the fraud because the Merger Agreement contained fraudulent statements and was entered into based on fraudulent statements made by IBT. CSB relies on *Petri v. Gatlin*, a

case in which the court found that the general prohibition against group pleading did not apply based on a "presumption that the allegedly false and misleading group published information complained of is the collective action of officers and directors." 997 F. Supp. 956, 974 (N.D. Ill. 1997) (quoting *In re Glen Fed, Inc. Sec. Litig.*, 60 F.3d 591, 593 (9th Cir. 1995)). CSB contends that, like in *Petri*, the Directors here knew of or were reckless in not knowing that IBT made misstatements, collectively approving of the representations being made to CSB to induce CSB to enter into the Merger Agreement.

The Seventh Circuit has rejected the group pleading doctrine for purposes of establishing the required scienter in securities fraud cases. *See Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008) ("We have rejected the 'group pleading doctrine,' a judicial presumption that statements in group-published documents are attributable to officers who have daily involvement in company operations; thus, the plaintiffs must create a strong inference of scienter with respect to each individual defendant."). But this does not necessarily extend to the common law fraud situation before the Court here, where CSB must only provide the Directors with fair notice of their individual participation in the fraud. *See Walls v. Vre Chicago Eleven, LLC*, No. 16-CV-4048, 2016 WL 5477554, at *9 (N.D. Ill. Sept. 29, 2016) (distinguishing *Pugh* and finding that "more general 'group pleadings' rule pertains to allegations of fraud where the complaint does not explain the role of different defendants," considering whether the individual defendants have been provided with fair notice of the nature of their alleged participation in the fraud). Under CSB's theory of the fraud, the Court finds that CSB has done so, indicating that by approving of the Merger Agreement and otherwise approving of IBT's actions in director-level decisions, the Directors as a whole participated and assisted in perpetrating a fraud on CSB. Although the Directors argue that *Petri* is distinguishable because the allegedly fraudulent statements here

11

were not made in group-published documents such as brochures or press statements, the reasoning in *Petri* can be extended to attribute the allegedly false and misleading information of which CSB complains collectively to the Directors who approved of the Merger Agreement. *See Petri*, 997 F. Supp. at 974–75. The Directors acknowledge that, as directors of IBT, they may be held liable for fraud if they "with knowledge, or recklessly without it, participate[d] or assist[ed] in the fraud." *Citizens Sav. & Loan Ass'n v. Fischer*, 214 N.E.2d 612, 615–16, 67 Ill. App. 2d 315 (1966). Because CSB has sufficiently alleged that it seeks to hold the Directors liable for their participation in IBT's fraud, putting them on notice of how they allegedly assisted that fraud—not by specifically making misrepresentations but by approving the Merger Agreement and IBT's leveraged loan growth, the Court finds that CSB has not improperly engaged in group pleading.

The Directors also argue, however, that CSB has failed to allege any false statements of material fact made to CSB. CSB's fraudulent inducement claim against the Directors focuses on two areas of allegedly fraudulent statements made by IBT: statements concerning IBT's ability to obtain regulatory approvals needed to consummate the merger and information IBT provided to CSB and regulatory agencies about its loan portfolio, which did not reveal IBT's planned rapid leveraged loan growth. The Court discusses the first category concerning regulatory approvals below; to the extent the Court finds the statements not actionable, the claims cannot proceed against the Directors as well. As for the leveraged loan portfolio, the Directors argue that nothing required disclosure of the leveraged loans, that CSB cannot allege that IBT ever lost money in connection with those loans, and that the FDIC's Leveraged Lending Guidance only indicates that banks like IBT should discuss appropriate controls for leveraged loans but does not impose limits on the amount of those loans. But the Court finds these issues more appropriate

for determination on a motion for summary judgment or at trial; at this stage, CSB contends that IBT failed to reveal information concerning IBT's leveraged loan portfolio, regardless of FDIC requirements, which would have been material to CSB's decision to enter into the Merger Agreement. That suffices to meet Rule 9(b)'s requirements, with factual disputes left for a determination on the merits.

### 2. Jaffe's Statements

CSB alleges that Jaffe represented to CSB's President that "he had an outstanding relationship with the regulators, that the regulators believed that Inland had a clean and sound balance sheet, and that there were no reasons why the regulators would disapprove of the merger." Doc. 49 ¶ 31. Under Illinois law, "alleged misrepresentations must be statements of present or preexisting facts, and not statements of future intent or conduct." *Ault v. C.C. Servs., Inc.*, 597 N.E.2d 720, 722, 232 Ill. App. 3d 269, 173 Ill. Dec. 746 (1992). Additionally, "the alleged misrepresentation must be one of fact and not an expression of an opinion." *People ex rel. Peters v. Murphy-Knight*, 618 N.E.2d 459, 463, 248 Ill. App. 3d 382, 187 Ill. Dec. 868 (1993).

Jaffe argues that to the extent the fraudulent inducement claim against him meets Rule 9(b)'s requirements, it nonetheless fails because it is premised on non-actionable statements. CSB responds that Jaffe's statements do not amount to puffery or opinion because Jaffe intended them to be taken as affirmative facts so as to influence CSB's decision to enter into the Merger Agreement. *See The Clearing Corp. v. Fin. & Energy Exch. Ltd.*, No. 09 CV 5383, 2010 WL 2836717, at *3 (N.D. Ill. July 16, 2010) (statements that party could "properly and adequately deliver services anticipated" in agreement were "about present abilities to handle certain services, and not promises of future performance"); *Stenograph Corp. v. Microcat Corp.*, No. 86

13

C 10231, 1989 WL 99543, at *2 (N.D. Ill. Aug. 22, 1989) (statements of opinion may be actionable as fraud where they are stated "as an affirmative fact material to the transaction, so that the other party may reasonably treat it as a fact and rely upon it as such" (citation omitted)).

Having reviewed the statements at issue, the Court cannot find that these statements are actionable. Jaffe's statement that he had an outstanding relationship with the regulators amounts to unquantifiable opinion about the quality of his relationship and his expectations about how such a relationship might influence future events. *See Neptuno Treuhand-Und Verwaltungsgesellschaft Mbh v. Arbor*, 692 N.E.2d 812, 229 Ill. App. 3d 567, 229 Ill. Dec. 823 (1998) (representation is an opinion if it expresses a "judgment as to quality, value, authenticity, or other matters of judgment" (quoting Restatement (Second) of Torts, section 538A)); *Marino v. United Bank of Ill., N.A.*, 484 N.E.2d 935, 937, 137 Ill. App. 3d 523, 92 Ill. Dec. 204 (1985) ("A representation is one of opinion rather than fact if it only expresses the speaker's belief, without certainty, as to the existence of a fact."). This statement does not establish present facts but instead suggests puffery. *See Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 846, 216 Ill. 2d 100, 296 Ill. Dec. 448 (2005) ("'Puffing' denotes the exaggerations reasonably to be expected of a seller as to the degree of quality of his or her product, the truth or falsity of which cannot be precisely determined. Such statements include subjective descriptions related to quality."); *Cont'l Bank, N.A. v. Meyer*, 10 F.3d 1293, 1299 (statements that horses were "of the highest quality" and that "partnership would be managed by competent general partners" were statements of opinion). The remaining statements are also not actionable because, as assessments of how the regulators would evaluate the merger and IBT's business, they amount to statements of opinion or inactionable puffery. *See In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 558 (S.D.N.Y. 2004) (statements of optimism about regulatory approval by FDA

amounted to non-actionable opinion, not guarantees, where regulatory issues were not under company's control). The Court does not find CSB's citations of *The Clearing Corp.* and *Stenograph Corp.* persuasive, for there, the statements related to a company's own ability to perform under a contract and here Jaffe's challenged statements relate to the regulators' evaluations of IBT and the regulators' future actions. Such statements amount only to Jaffe's opinion and thus cannot form the basis of a fraudulent inducement claim.

### B. Fraudulent Inducement Claim against IBT (Count I)

Next, the Court addresses CSB's fraudulent inducement claim against IBT. CSB contends that IBT made a false statement of material fact by warranting in § 5.6 of the Merger Agreement that there was no reason why required regulatory approvals to complete the merger would be denied or unduly delayed more than five months beyond the date the Merger Agreement was entered. Additionally, CSB contends IBT made similar oral representations that it did not know of any reason why it would be unable to obtain regulatory approval.

First, IBT argues that CSB cannot rely upon § 5.6 of the Merger Agreement as a basis for its fraudulent inducement claim. "[A] fraud claim may not be premised on the mere breach of a contract; rather, there must be a 'fraudulent act distinct from the alleged breach of contract.'" *Mandel Metals, Inc. v. Walker Grp. Holdings*, No. 14 CV 8493, 2015 WL 3962005, at *6 (N.D. Ill. June 26, 2015) (quoting *Greenberger v. GEICO Gen. Ins. Co.*, 631 F.3d 392, 401 (7th Cir. 2011)). CSB may not take its breach of contract claim and "dress [it] up in the language of fraud" in an attempt to state a fraudulent inducement claim. *Greenberger*, 631 F.3d at 395 ("[F]raud claims must contain something more than reformulated allegations of a contractual breach. . . . [B]reach-of-contract allegations dressed up in the language of fraud . . . cannot support statutory or common-law fraud claims."). That is all CSB has done here with respect to

15

its claim that IBT falsely warranted in the Merger Agreement that there was nothing preventing regulatory approval within five months of signing the agreement. CSB has not provided any allegations so as to distinguish this statement from its breach of contract claim. Nor does the fact that the FDIC ultimately withdrew its approval of the merger demonstrate that IBT had no intention to comply with the warranty when entered, particularly where IBT pursued the approvals and initially obtained them within the agreed upon timeframe. *Cf. United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854 (7th Cir. 2009) ("Simple breach of contract is not fraud, but making a promise while planning not to keep it *is* fraud."). Therefore, CSB cannot pursue a fraudulent inducement claim against IBT or the Directors based on this alleged false statement contained in the Merger Agreement. *See Mandel Metals, Inc.*, 2015 WL 3962005, at *7 (finding fraud claim based on promise to deliver aluminum of certain thickness to be reformulation of breach of contract claim as there were no standalone allegations of a fraudulent act).

As for the allegedly fraudulent oral representations, IBT argues that CSB has not pleaded these statements with particularity and that to the extent they are based on Jaffe's statements, those are nonactionable opinions. CSB responds that it has laid out in detail the particular statements Jaffe made to CSB concerning regulatory approval. These are the same statements the Court considered above. As discussed there, CSB cannot proceed on these statements because they constitute nonactionable opinions and puffery.

### C. Fraud Claim against IBT (Count III)

IBT also moves to dismiss CSB's fraud claim against IBT, based on IBT's representations during a May 5, 2015 phone call with CSB that IBT had "satisfied all of its conditions under the Merger Agreement and [IBT] was prepared to imminently consummate the

16

Merger." Doc. 49 ¶ 134. The Court previously addressed this same claim, finding that CSB had "plausibly alleged, based on the surrounding circumstances, that the statements that IBT had complied with all conditions precedent to closing and was ready to consummate the merger, as made on that May 5 call, were false." Doc. 30 at 8. IBT argues that, after discovery, that statement no longer holds true, and CSB cannot argue that IBT knew during the May 5 call that the FDIC planned to withdraw regulatory approval of the merger and can no longer rely on allegations based on information and belief.

Although the informational asymmetries present previously have largely disappeared thanks to discovery, the Court nevertheless continues to find that CSB has sufficiently pleaded a basis to suggest that IBT made a false statement on May 5 concerning its ability to consummate the merger. As pleaded in the first amended complaint, in the weeks leading up to the May 5 call, FDIC examiners expressed concerns to IBT management about IBT's leveraged lending portfolio, causing IBT senior management members to ask whether findings from the examination could result in the withdrawal of regulatory approval. Based on the FDIC examiner's equivocal response; the referral to the FDIC assistant regional director for further followup, which IBT did not pursue; and Jaffe's push to close the merger before the end of the FDIC examination, one can draw a reasonable inference that IBT falsely represented its ability to close the merger on May 5. Therefore, the Court will not dismiss this claim.

### D. Fraudulent Concealment (Counts I–III)

CSB's fraud claims also generally allege that IBT and the Directors failed to disclose material facts to CSB. IBT and the Directors argue that CSB cannot proceed on any such fraudulent concealment claims because CSB has not pleaded them with specificity and CSB has not pleaded, and IBT and the Directors do not have, a duty to disclose any material facts to CSB.

Initially, the first amended complaint includes various allegations outlining IBT's failure to disclose material facts to CSB. The fact that CSB included these specific omissions in the background section of the first amended complaint and then only generally referred to "omissions" under the specific counts while incorporating the prior paragraphs does not diminish the specificity of CSB's pleadings. *See Walls*, 2016 WL 5477554, at *10 (noting that "this method of pleading results in a well organized and readable complaint").

Moving on to IBT and the Directors' argument concerning the existence of a duty, a duty to disclose arises where the parties are in a fiduciary or confidential relationship or where the plaintiff has placed trust and confidence in the defendant so that the defendant is in a position of influence or superiority over the plaintiff. *Guvenoz v. Target Corp.*, 30 N.E.3d 404, 425, 2015 IL App (1st) 133940, 391 Ill. Dec. 134 (2015). CSB does not argue that such a relationship existed here. Instead, it contends that IBT made incomplete disclosures, thus giving rise to "a duty to disclose whatever additional information [was] necessary to rectify the misleading statements." *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 944 (7th Cir. 1989) (discussing omissions in context of Rule 10b-5 claim). During a business transaction, "[t]he concealment of a material fact . . . is actionable if done with the intention to deceive under circumstances creating an opportunity and duty to speak." *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 969, 351 Ill. App. 3d 752, 286 Ill. Dec. 734 (2004) (citations omitted) (internal quotation marks omitted). "A statement which is technically true may nevertheless be fraudulent where it omits qualifying material since a 'half-truth' is sometimes more misleading than an outright lie." *Id.* CSB contends that IBT did not provide CSB with facts concerning its leveraged loan portfolio that would have suggested potential problems in obtaining FDIC regulatory approval,

18

instead representing that no impediments stood in the way of such approval. In this situation, IBT's incomplete disclosures provide the required duty to speak.

IBT again argues that it could not share information with CSB regarding the FDIC's examination and so any omissions related to these issues cannot form the basis of CSB's fraud claims. As the Court noted in its prior Opinion on the same issue, resolving issues concerning whether IBT was required to maintain the confidentiality of any FDIC examinations taking place in April or May 2015 involves factual circumstances surrounding the examination, interpretation of the Merger Agreement, and statutory interpretation. Doc. 30 at 8–9. As this is not a proper inquiry on a motion to dismiss, the Court leaves the question for another day, allowing CSB to pursue its fraudulent concealment claims.[6]

## II. Breach of Contract Claim (Count IV)

Finally, IBT seeks dismissal of CSB's breach of contract claim premised on § 5.6 of the Merger Agreement, in which IBT represented that there was no reason why the required regulatory approvals for the merger would be denied or unduly delayed beyond a date five months after the agreement date. IBT argues that such a claim fails because, as of March 22, 2015, which was five months after the agreement date, IBT had obtained regulatory approval to close the merger, with regulatory approval only revoked later, in May 2015. CSB responds that the time period provided in § 5.6 refers only to delays in regulatory approvals, not to denials. But this ignores the plain language of the section, which reads "there is no reason why the granting of any of the Regulatory approvals required to be obtained by Inland to consummate the Contemplated Transactions would be denied or unduly delayed beyond a date which is five (5) month after the Agreement Date." Doc. 49 ¶ 29. The time period applies to both the denial and

---

[6] The confidentiality issue also would only affect omissions related to the fraud claim against IBT and not the fraudulent inducement claims.

19

delay of regulatory approval. Because IBT had obtained the regulatory approvals within this time period, with later events causing the withdrawal of the FDIC's approval in May 2015, CSB cannot pursue its claim for breach of § 5.6 of the Merger Agreement.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part IBT and the Directors' motion to dismiss [60]. The Court dismisses CSB's fraudulent inducement claims based on alleged misstatements in the Merger Agreement and those based on Jaffe's statements contained in ¶ 31 of the first amended complaint. The Court dismisses CSB's breach of contract claim premised on violation of § 5.6 of the Merger Agreement with prejudice. The Court orders IBT and the Directors to answer the remaining allegations of the first amended complaint by December 19, 2017. The Court orders the parties to file a statement by December 15, 2017 regarding the propriety of maintaining the first amended complaint [49], Defendants' memorandum in support of their partial motion to dismiss [63], and CSB's response to the motion to dismiss [70] under seal.

Dated: November 27, 2017

SARA L. ELLIS
United States District Judge