# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| BRIAN J. O'DONOGHUE, as authorized representative, | ) ) ) | |
| Plaintiff, | ) ) | No. 15 C 11603 |
| v. | ) ) | Judge Sara L. Ellis |
| INLAND BANK AND TRUST, LAWRENCE AARON, MATTHEW FIASCONE, NICHOLAS HELMER, HOWARD A. JAFFE, HARRY L. LUKENS, JR., JOEL SIMMONS, and PAUL J. WHEELER, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Brian J. O'Donoghue, as an authorized representative of College Savings Bank ("CSB"), brings this suit against Inland Bank and Trust ("IBT"), and IBT's directors, Lawrence Aaron, Matthew Fiascone, Nicholas Helmer, Howard A. Jaffe, Harry L. Lukens, Jr., Joel Simmons, and Paul Wheeler (collectively, the "Directors"). In the first amended complaint, CSB alleges that IBT and the Directors committed fraud and IBT breached its contract with CSB in connection with the 2015 failed merger of the two banks. IBT and the Directors have filed a motion for summary judgment on all of CSB's remaining claims.

The Court finds that CSB has not raised any disputed issues of fact on its claims for fraudulent inducement against IBT and the Directors and breach of contract against IBT with respect to the information IBT provided to CSB and the termination of the merger agreement. The Court therefore grants summary judgment for IBT and the Directors on these claims. But genuine issues of fact remain on CSB's fraud claim against IBT and the breach of contract claim with respect to whether IBT promptly notified CSB of the regulatory suspension of the merger

and took actions to impair, delay, or prevent the closing of the merger. With respect to these remaining viable claims, the Court concludes that CSB may not base its damages calculations on NexBank SSB's withdrawn bid to acquire CSB in August 2014.

## BACKGROUND[1]

In 2013, IBT, an FDIC-insured, state-chartered bank headquartered in Oak Brook, Illinois, received a directive from its holding company's board of directors to increase IBT's size to better position it for a liquidity event. It then pursued two growth strategies: (1) attracting more deposits and making more loans, and (2) acquiring other banks. To further the second strategy, IBT engaged in conversations with CSB, a New Jersey-based bank that specialized in certificates of deposit under college savings programs and had investments in student loans and mortgage-backed securities. After negotiations, on or about October 22, 2014, IBT and CSB entered into a contract (the "Merger Agreement"), which provided for IBT to acquire CSB. The Directors approved the acquisition of CSB by IBT on or about July 28, 2014.

Jaffe executed the Merger Agreement on IBT's behalf as its then-CEO and Chairman of the Board. The Merger Agreement included various terms and conditions that IBT and CSB had to meet prior to the consummation of the merger. Because IBT was subject to a 2012 FDIC consent order, IBT needed regulatory approval of the acquisition and so agreed to obtain that approval from regulators, including the FDIC, as a precondition to closing. IBT also agreed to promptly notify CSB of any material non-confidential communications it received from regulators and of any issues that could affect its ability to close and not to take "any affirmative action, or fail to take any reasonable action within its control, the effect of which would be to

---

[1] The facts in this section are derived from the Joint Statement of Undisputed Material Facts and the parties' additional facts included in their response and reply. The Court has included in this background section only those facts that are appropriately presented, supported, and relevant to resolution of the pending motion for summary judgment. All facts are taken in the light most favorable to CSB, the non-movant.

materially impair, delay or otherwise prevent the consummation of the Contemplated Transaction." Doc. 93-2 § 7.5(b). Under § 7.2, IBT indicated that none of the information it provided to CSB or any regulatory agency would, at the time of filing, "be false or misleading with respect to any material fact, or omit to state any material fact necessary in order to make the statements therein not misleading." *Id.* § 7.2.

In return, CSB agreed to sell all of its investment assets prior to the closing of the transaction, a condition imposed by IBT because it wanted to use these acquired funds to purchase leveraged lending participations.[2] O'Donoghue, on CSB's behalf, indicated that this condition posed a risk to CSB, as it would leave CSB with only cash as its income-producing asset. To address this concern, IBT agreed that prior to the sale, it would certify that it had no knowledge that it had not satisfied any of the Merger Agreement's conditions.

Upon execution of the Merger Agreement, IBT set out to obtain the required regulatory approvals. IBT's counsel filed an Interagency Bank Merger Application ("Merger Application") with the FDIC, the Illinois Department of Financial and Professional Regulation ("IDFPR"), and the New Jersey Department of Banking and Insurance. The FDIC approved the merger on December 23, 2014, and IBT obtained the other required approvals thereafter. The FDIC's Assistant Regional Director, David Van Vickle, did not recall any issues with the Merger Application that would have kept the FDIC from approving the application at that time. But ultimately, the FDIC identified such an issue with IBT's leveraged lending portfolio.

IBT began purchasing high-risk leveraged lending participations in 2013, mainly from BancAlliance and Balbec Capital. The FDIC and other federal agencies issued guidance on

---

[2] Leveraged loans are extended to companies or individuals with considerable debt, carrying with them higher interest rates and also higher rates of return to the lender. IBT purchased leveraged lending participations, which were interests in leveraged loans originated and sold by third parties, meaning that IBT did not do the original due diligence on the loan or have a relationship with the borrower.

3

leveraged lending in March 2013 (the "Interagency Guidance"). IBT's Senior Vice President of Regulatory Compliance, Deborah Bartelt, reviewed the Interagency Guidance and shared it with IBT's loan department and credit and lending staff. Other community banks similarly bought leveraged lending participations from BancAlliance and Balbec, both of which represented having positive interactions with the FDIC regarding the leveraged loans. Jaffe spoke to some of these community banks, which indicated that they did not have issues with their leveraged lending activity in bank examinations or other dealings with regulators.

In March 2014, IBT amended its loan policy to allow it to approve loans up to $7 million without requiring Directors Loan Committee approval. In December of that year, IBT changed the risk grade description of a loan assigned a grade 5 from "low pass" to "acceptable." *Id.* ¶ 50. It also increased the allowable ratio of leveraged lending to capital from 100% to 200%. These changes allowed IBT's leveraged loan portfolio to grow exponentially. IBT's leveraged loan portfolio grew 611% in the twelve-month period ending March 31, 2015. In January 2014, IBT provided the FDIC with a budget report, indicating a total of $140 million in commercial and industrial loans, a category that includes leveraged lending. By the end of September, IBT had booked $180.66 million in commercial and industrial loans and funded 82% of its leveraged loans. IBT funded the remaining 18% of its leveraged loans between October 22, 2014, and May 15, 2015. IBT included its commercial and industrial loan totals in reports to the FDIC, but it did not separately provide the FDIC with information about its leveraged loan portfolio. These form reports, including quarterly call reports and Uniform Bank Performance Reports ("UBPRs"), did not include separate line items requesting specific information about leveraged loan totals.

By the fall of 2014, individuals both inside and outside of IBT voiced concern about the growth of IBT's leveraged lending portfolio. On October 14, 2014, Bartelt sent Jaffe an email expressing concern about IBT's growth goals and the potential that "examiners will see . . . excessive growth funded by volatile, noncore sources." Doc. 93 ¶ 54. Bartelt recommended that IBT stop pursuing leveraged loan participations, noting that "[t]hey are not relationship based and do not add value to the overall company." *Id.* After the FDIC and other agencies issued a joint release expressing concerns about leveraged lending, Fiascone sent an email to Jaffe on November 8, 2014, asking whether the FDIC would focus on leveraged lending during IBT's next examination and whether the Board should discuss the issue at its next meeting. Jaffe acknowledged the issue leveraged lending might pose during the FDIC's examination in an email to a Balbec employee in February 2015. Jaffe also received warnings from two principals of Sandler O'Neill, an investment banking firm, that regulators disapproved of leveraged lending participations as an asset class.

In connection with the negotiation of the Merger Agreement and thereafter, IBT orally represented to CSB that it knew of no reason why the relevant regulatory authorities would not approve the merger. For example, Jaffe told CSB that, to the best of his knowledge, IBT "would not have any issues in getting regulatory approval" and that IBT had "a good relationship with regulators." *Id.* ¶ 20. These assurances were important to CSB, which did not want a deal that would run into issues with regulators and fail to close. O'Donoghue did not know of IBT's leveraged lending portfolio when CSB entered into the Merger Agreement and IBT did not inform CSB of the exact amounts of its leveraged lending but instead included the amounts as part of the broader commercial and industrial loan numbers. O'Donoghue did review publicly available documents about IBT's finances, but these documents did not single out the leveraged

loan amounts. O'Donoghue also knew that regulators were looking more closely at banks at the time, but he did not know of any specific FDIC regulations related to leveraged lending.

In April 2015, the FDIC and IDFPR began IBT's annual Safety and Soundness Examination. The examiners focused on IBT's leveraged loan portfolio, asking about IBT's strategy with respect to these loans. Bartelt considered the examiners' interest to be in the ordinary course of business, although she noted that the examiners' scrutiny of the leveraged lending portfolio increased as the examination unfolded. Michael Mahon, the FDIC's examiner in charge, met with Jaffe and Bartelt during the first week of the examination and expressed discomfort with IBT's leveraged lending program and concern that IBT would use the funds from the CSB merger to increase IBT's leveraged lending participations. IBT's senior management inquired whether the FDIC's findings could result in the withdrawal of regulatory approval for the merger, to which Mahon responded that "it very well could." *Id.* ¶ 70. The examiners also held a two-hour meeting with Bartelt and other IBT employees to discuss IBT's leveraged lending, after which one IBT employee noted that it "seem[ed] like [the FDIC's] mind was made up before they got here." *Id.* ¶74. IBT did not inform CSB of the examiners' concerns about IBT's leveraged lending portfolio or how IBT would use the funds it gained from the merger. Instead, Jaffe told O'Donoghue that the "exam was going well" and "no ascertainable big issues . . . were coming out of the reviews." *Id.* ¶ 77.

While the examination was ongoing, on April 28, CSB sold approximately 98% of its student loan portfolio. On May 1, Jaffe pressed O'Donoghue for an update on the closing date because he wanted to get the deal closed. During a May 5 phone call, Jaffe directed CSB to sell its remaining investment assets and suggested a closing date of May 12. O'Donoghue indicated that CSB needed more time to finalize the sale of the remaining investment assets, and the

parties ultimately agreed to a May 15 closing date. On May 6, IBT advised the IDFPR's Division of Banking of the closing date. CSB finalized the sale of its remaining investment assets on May 12.

On May 7, Bartelt received an email from Mahon asking her to call him as soon as possible. On May 8, Van Vickle spoke with Jaffe and informed him that the FDIC was suspending approval of the merger in light of the FDIC's concerns about IBT's leveraged lending program. Van Vickle indicated the suspension was pending the closing conference of the FDIC's examination on May 12, but the IBT Board received a formal letter from the FDIC on May 8 that reiterated that the FDIC had suspended its approval of the merger. Bartelt, Jaffe, and Peter Stickler, IBT's Executive Vice President and Chief Financial Officer at the time, deny having had any prior indication from the examiners that the FDIC would suspend the merger. During the May 12 closing conference, the FDIC downgraded IBT and requested additional information about the merger.

In a May 11 phone call, Jaffe told O'Donoghue that an issue had arisen with the closing, not that the FDIC had suspended its approval of the merger. CSB learned of the suspension on May 12 from the New Jersey Department of Banking and Insurance. On May 15, the IBT Board approved certain resolutions in response to the FDIC examination, which included selling the Balbec portfolio of leveraged loan participations. IBT then wrote to CSB on May 20, stating it could not take any action to close the transaction because of the FDIC's suspension of approval. IBT also indicated that it "continue[d] to diligently pursue in good faith, and use its Best Efforts to obtain and/or satisfy all regulatory approvals and requirements necessary to consummate the Contemplated Transactions prior to the Termination Date." *Id.* ¶ 100. Despite IBT submitting more information to the FDIC and requesting a further detailed meeting with the examiners, Van

Vickle told Jaffe that "there's no hope" of the suspension being lifted. *Id.* ¶ 98. The FDIC formalized its refusal to lift the suspension on May 26.

By May 29, Jaffe informed CSB that it was "in their best interest to seek alternatives to their planned sale," but IBT did not inform CSB that the FDIC indicated it would not lift the merger's suspension. *Id.* ¶ 105. Instead, on June 2, IBT signed a waiver allowing CSB to shop itself to others. On the same day, IBT also sent a letter to CSB terminating the Merger Agreement. The termination generally cited § 11, the termination provision, and claimed, without limitation to other bases, that CSB had not complied with the Merger Agreement's conditions. CSB rejected the termination on June 4 and demanded that IBT use its best efforts to obtain FDIC approval and close the transaction.

On May 15, the projected closing date prior to the FDIC's suspension of approval, IBT had sufficient funds to close the merger. If CSB and IBT had merged at that time, CSB would have received approximately $39.4 million from the merger. On December 1, NexBank SSB, a regional bank headquartered in Dallas, Texas, acquired CSB. CSB received $37.2 million from NexBank. NexBank had also expressed interest in acquiring CSB before CSB entered into the Merger Agreement with IBT, having submitted a bid in August 2014 that it subsequently withdrew on September 30, 2014. CSB contends it would have received $44.9 million if CSB and NexBank had entered an agreement based on the August 2014 bid and closed in May 2015.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and

affidavits that are part of the record. Fed. R. Civ. P. 56 & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## ANALYSIS

### I.      Fraud Claims (Counts I–III)

In the first amended complaint, CSB asserts fraudulent inducement and fraud claims against IBT and the Directors. For these claims, CSB must establish that (1) IBT and the Directors made a false statement or omission of material fact, (2) IBT and the Directors knew of or believed in its falsity, (3) IBT and the Directors intended to induce CSB to act, (4) CSB acted in reliance on the truth of IBT's and the Directors' statement, and (5) damages resulted from CSB's reliance. *Weidner v. Karlin*, 932 N.E.2d 602, 605, 402 Ill. App. 3d 1084, 342 Ill. Dec. 475 (2010). Additionally, to the extent CSB claims fraudulent concealment, it must demonstrate that IBT and the Directors had a duty to disclose the omitted fact to it. *Id.*; *see also Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 613 (7th Cir. 2013).

## A. Fraudulent Inducement (Counts I and II)

CSB claims IBT and the Directors fraudulently induced CSB to enter into the Merger Agreement based on IBT and the Directors' failure to disclose IBT's leveraged lending activity.[3] IBT and the Directors respond that nothing required them to disclose IBT's leveraged loan portfolio to CSB or the FDIC in the Merger Application, meaning CSB cannot establish a material misleading statement or omission.

### 1. Omissions in Regulatory Filings

IBT and the Directors first argue that CSB cannot succeed on its fraudulent inducement claim based on alleged omissions in regulatory filings concerning IBT's leveraged lending portfolio. Although CSB responds that IBT sought to conceal the leveraged lending purchases from the FDIC, it makes no argument that IBT had a duty to provide that information in its FDIC filings. The parties agree that the FDIC quarterly call reports and UBPRs have no separate category for disclosing leveraged lending, with that category of lending instead lumped into commercial and industrial loans. Similarly, CSB does not provide any evidence to suggest that IBT had to separately disclose its leverage lending portfolio as part of the Merger Application. Nor does CSB offer evidence that banks typically separate out their leveraged lending portfolios (or other subcategories of loans) in these regulatory filings. *See S.E.C. v. Kameli*, 276 F. Supp. 3d 852, 864 (N.D. Ill. 2017) (in denying preliminary injunction, noting that the SEC had not presented any argument or evidence suggesting that defendants were required to disclose specific

---

[3] In ruling on IBT and the Directors' motion to dismiss the first amended complaint, the Court dismissed CSB's fraudulent inducement claims to the extent based on the representation made in the Merger Agreement concerning regulatory approvals or Jaffe's statements contained in ¶ 31 of the first amended complaint. Doc. 79 at 14–16. In moving for summary judgment, IBT and the Directors also address a representation in the Merger Agreement that IBT had sufficient funds to satisfy its obligations under that agreement to pay CSB the agreed upon consideration at the time of closing. But CSB disclaims this representation as a basis for its fraudulent inducement claims. *See* Doc. 99 at 20 n.4. The Court deems this basis for the fraudulent inducement claims withdrawn and does not address it further, focusing instead on IBT and the Directors' alleged lack of disclosure about IBT's leveraged lending activities.

payments and agreements or that others in the industry customarily disclosed such information). And CSB does not dispute that IBT included its leveraged loan activity as part of its commercial and industrial loan portfolio in its filings, to which CSB had access. Therefore, CSB has failed to create a genuine issue of fact as to whether IBT and the Directors made false or misleading statements or material omissions in regulatory filings concerning IBT's leveraged lending portfolio.

### 2. Pre-Closing Omissions

Alternatively, CSB argues that IBT and the Directors failed to disclose material information to CSB regarding IBT's leveraged lending portfolio prior to CSB entering the Merger Agreement. IBT and the Directors again argue that they did not have an affirmative duty to disclose such information. A duty to disclose arises where the parties are in a fiduciary or confidential relationship or where the plaintiff has placed trust and confidence in the defendant so that the defendant is in a position of influence or superiority over the plaintiff. *Guvenoz v. Target Corp.*, 30 N.E.3d 404, 425, 2015 IL App (1st) 133940, 391 Ill. Dec. 134 (2015). Additionally, in a business transaction, "[t]he concealment of a material fact . . . is actionable if done with the intention to deceive under circumstances creating an opportunity and duty to speak." *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 969, 351 Ill. App. 3d 752, 286 Ill. Dec. 734 (2004) (citations omitted) (internal quotation marks omitted). "A statement which is technically true may nevertheless be fraudulent where it omits qualifying material since a 'half-truth' is sometimes more misleading than an outright lie." *Id.* In addressing IBT and the Directors' motion to dismiss the first amended complaint, the Court concluded that CSB had adequately alleged that IBT and the Directors had a duty to speak where CSB claimed that IBT did not provide CSB with facts concerning its leveraged loan portfolio

that would have suggested potential problems in obtaining FDIC regulatory approval and instead represented that no impediments stood in the way of such approval.

IBT and the Directors ask the Court to revisit this decision, arguing that, in light of "the nature of the transaction and the characteristics of the parties," no disclosure obligation attached with respect to IBT's leveraged lending portfolio. *PXRE Reinsurance Co. v. Lumbermens Mut. Cas. Co.*, 342 F. Supp. 2d 752, 758 (N.D. Ill. 2004). They liken the situation in this case to that in *PXRE*, where the court concluded that the defendant had no obligation to reveal certain information based on (1) both parties being "sophisticated entities familiar with the reinsurance market" and negotiating at arms-length; (2) the nature of the transaction, which "required each side to engage in valuations of risk that, though complex for nonprofessionals, were well within their area of competence;" and (3) the valuations being based on information to which both parties had access. *Id.* Here, both parties were sophisticated entities, with CSB making a point of hiring a law firm with extensive and recent experience in large mergers and acquisitions to handle the deal. The merger required both parties to evaluate their risk. IBT sought extensive due diligence to do so, obtaining access to CSB's financial statements and reports. The Merger Agreement did not provide for similar access to IBT's financial records, suggesting CSB's focus was not on IBT's financial situation but instead on obtaining regulatory approval for the merger. Although *PXRE*'s first two factors support finding no duty, CSB's lack of access to information differentiates this case from *PXRE*, where, as CSB points out, the plaintiff had access to all of the defendant's files and chose not to carry out a total review of that information. *Id.* at 758. Here, CSB did not have access to all of IBT's financial records, IBT did not publicly report specific information about its leveraged lending, and O'Donoghue claims he reviewed financial information given to him by IBT when he visited IBT before entering the Merger Agreement but

none of that information disclosed IBT's leveraged lending program.  A juror could conclude that CSB chose not to pursue that information.  *See id.* at 758–59 ("But no one held a gun to PXRE's corporate head—it was free to make the deal or pass it up as it chose. . . . [I]t chose to examine the portion of the portfolio that it wished and to make the deal on that basis. . . . If it is disappointed in the deal that it made, that must be viewed as a self-inflicted wound—the result of the nature and scope of the due diligence review that it chose to make[.]").  Alternatively, a juror could reasonably find that CSB did not realize the need to obtain such information based on IBT's other representations.  Therefore, the Court finds a material issue of fact as to whether IBT and the Directors had a duty to speak with respect to the leveraged lending program.

But CSB's fraudulent inducement claim based on these omissions fails nonetheless because CSB has not provided any evidence to suggest that IBT or the Directors had the requisite scienter and intentionally concealed information from CSB about the leveraged lending program.  Indeed, no evidence even suggests that any of the Directors, aside from Jaffe, had any involvement in the negotiations with CSB or that IBT and the Directors considered that the leveraged lending program would affect the merger before the parties entered into the Merger Agreement.[4]  CSB argues in conclusory fashion that a trier of fact could find that IBT and the Directors acted with the requisite scienter, but CSB fails to provide any evidence that would allow the trier of fact to draw such an inference.  *See Munson v. Friske*, 754 F.2d 683, 690 (7th Cir. 1985) ("[A]lthough summary judgment is usually not proper in a case involving a weighing of conflicting questions of motive and intent, summary judgment is proper where the plaintiff presents no indications of motive and intent supportive of his position.").  And the cases CSB cites are distinguishable because in those cases, the non-moving party provided at least some

---

[4] CSB points to an email from Fiascone noting the FDIC's focus on leveraged lending, but Fiascone sent this email on November 8, 2014, after CSB and IBT entered the Merger Agreement, and so it cannot serve as a basis to create an issue of fact concerning scienter.

circumstantial evidence of scienter, while CSB relies only on legal conclusions. *See McCarthy v. Ameritech Publ'g, Inc.*, 763 F.3d 469, 479–81 (6th Cir. 2014) (reviewing circumstantial evidence that supported finding a question of fact as to whether defendant "intentionally or recklessly provided inaccurate information" to induce plaintiff to continue working); *Canadian Pac. Ry. Co. v. Williams-Hayward Protective Coatings, Inc.*, No. 02 C 8800, 2005 WL 782698, at *24 (N.D. Ill. Apr. 6, 2005) (finding a question of fact on scienter issue where party presented evidence suggesting defendant "made representations in reckless disregard or culpable ignorance of their truth or falsity"). Having failed to marshal any evidence on the issue, CSB cannot proceed further on this aspect of its fraudulent inducement claims. *See Thornton v. M7 Aerospace LP*, 796 F.3d 757, 768 (7th Cir. 2015) ("[S]urviving summary judgment requires evidence, not assumptions."); *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) ("Summary judgment 'is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.'" (quoting *Schacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999))).

## B. Fraud Claim against IBT (Count III)

CSB bases its fraud claim on statements Jaffe made during a May 5, 2015 phone call with CSB that IBT had "satisfied all of its conditions under the Merger Agreement and [IBT] was prepared to imminently consummate the Merger."[5] Doc. 49 ¶ 134. IBT argues that CSB cannot establish that IBT knew or believed that these statements were false or misleading. But the evidence of record creates a question of fact on this issue. Admittedly, the FDIC did not suspend its approval until three days after the May 5 phone call, and Bartelt, Jaffe, and Stickler all

---

[5] CSB also claims that its fraud claim encompasses Jaffe's statements to CSB that the examination was going well. CSB did not set forth this statement as a basis for its fraud claim in the first amended complaint. Even if it had, the Court would find it a nonactionable statement of opinion, similar to Jaffe's other statements about the regulators that the Court previously found amounted to statements of opinion or nonactionable puffery. *See* Doc. 79 at 14–15 (citing cases).

testified that they had no prior indication of the FDIC's suspension of approval. But the evidence also indicates that, in the weeks leading up to the May 5 call, FDIC examiners expressed concerns to IBT management about IBT's leveraged lending portfolio and focused more on that portfolio than any other part of IBT's business during its examination. This caused IBT senior management members to ask the FDIC examiners whether their findings could result in the withdrawal of regulatory approval. The examiner in charge responded that the possibility existed. Although IBT claims it did not consider the FDIC's concerns about leveraged lending surprising or out of the ordinary, a reasonable juror could conclude from the evidence that IBT should have known that Jaffe's May 5 statements were false or misleading, or at least that IBT acted in reckless disregard of the truth. *See Gerill Corp. v. Jack L. Hargrove Builders, Inc.*, 538 N.E.2d 530, 536, 128 Ill. 2d 179, 131 Ill. Dec. 155 (1989) ("[A] misrepresentation is fraudulent either where a party makes the representation knowing it is false *or* where the misrepresentation was made with a reckless disregard for its truth or falsity.").

Alternatively, IBT argues that CSB cannot prevail on its fraud claim because IBT could not disclose the information regarding the examination while it was ongoing. FDIC regulations exempt from disclosure "[r]ecords that are contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of the FDIC." 12 C.F.R. § 309.5(g)(8). Although IBT claims that the regulations prohibited any disclosure of the FDIC's concerns during the examination, the regulations allow for disclosure with the FDIC's authorization. Specifically, the regulations allow for the disclosure of exempt records or information contained therein with the "written authorization from the Director of the [FDIC]'s Division having primary authority over the records or information." 12 C.F.R. § 309.6(a). And another section provides that IBT could not make any representations about the report of examination or the

FDIC's examination findings, except as otherwise allowed under other provisions of the regulations, meaning absent specific authorization from the FDIC.  12 C.F.R. § 350.9.  IBT admits that it did not ask the FDIC for permission to inform CSB of the FDIC's concerns during the examination.  As a result, the Court cannot find as a matter of law that IBT could not disclose any information about the FDIC's examination to CSB.  Because issues of fact exist with respect to CSB's fraud claim against IBT, the Court denies IBT's motion for summary judgment on this claim.

## II.     Breach of Contract Claim (Count IV)

To prevail on its breach of contract claim, CSB must prove (1) the existence of a valid, enforceable contract; (2) its performance of all required conditions under the contract; (3) IBT's breach of the contract; and (4) resulting injury.  *Henderson-Smith & Assocs., Inc. v. Nahamani Family Serv. Ctr., Inc.*, 752 N.E.2d 33, 43, 323 Ill. App. 3d 15, 256 Ill. Dec. 488 (2001).  IBT argues it did not breach any of challenged sections of the Merger Agreement.  The Court reviews each alleged breach below.

### A.     Prompt Notification of FDIC Decision to Suspend Approval of the Merger (Sections 7.1, 8.1(b), and 8.2)

First, CSB claims that IBT failed to promptly notify CSB of the FDIC's suspension of the approval of the merger, violating §§ 7.1, 8.1(b), and 8.2 of the Merger Agreement.  IBT argues, as it did in its first motion to dismiss, that it did not violate these sections because it promptly informed CSB of the FDIC's decision to suspend the merger.  The parties differ on the meaning of "prompt," which the Merger Agreement does not define and on which this claim of breach turns.

The FDIC's examiner in charge reached out to Bartelt on May 7, 2015, previewing the examination results and suggesting that its findings were adverse to the merger.  IBT officially

learned of the FDIC's suspension of approval the following day, on May 8, 2015, a Friday, with Van Vickle calling Jaffe to share the news and thereafter emailing Jaffe the merger suspension letter at 4:28 p.m.  Jaffe informed certain individuals at IBT of the merger suspension later that day.  But he did not reach out to CSB until Monday, May 11, when he called O'Donoghue.  Jaffe testified that he called or left a voicemail that morning, but his telephone records show a call at 5:48 p.m.  O'Donoghue testified that during that call, Jaffe told him the closing might be slightly delayed, with O'Donoghue learning of the suspension on May 12 in conversations with the New Jersey Department of Banking and Insurance.  CSB's attorney left a voicemail for IBT's attorney on May 12 to discuss the suspension, and Jaffe and O'Donoghue spoke after IBT's exit meeting with the FDIC that day.  IBT's counsel wrote to CSB on May 20, stating that the FDIC had suspended its approval of the merger, IBT could not take any action to consummate the merger, and IBT continued to seek to satisfy all the conditions of the Merger Agreement in good faith and using its best efforts.  IBT formally learned that the FDIC would not lift its suspension of the merger on May 26.  By May 29, Jaffe had told CSB that it would be in its best interests to look for other alternatives to merging with IBT but did not inform CSB of the FDIC's final decision at that time.

Based on this timeline of events, IBT argues that the trier of fact could only conclude that it promptly notified CSB of the suspension.  CSB disagrees, arguing that issues of fact exist not only with regard to the timeline but also with the interpretation of the term "prompt."  The Court agrees with CSB that the issues surrounding IBT's giving of notice are classic factual questions that the parties must submit to the jury.  The parties disagree on some of the key facts in the timeline, including when IBT learned of and informed CSB of the suspension.  Moreover, the parties differ on the definition of "prompt," which the Merger Agreement does not define.

Because promptness is a matter of interpretation and degree, the Court cannot determine whether

the notice IBT provided to CSB amounts to prompt notification in this specific situation.

Therefore, the jury must resolve this question.[6]

### B.     Information Provided to CSB (Section 7.2)

CSB bases its next claimed breach on § 7.2 of the Merger Agreement, which provides:

> Inland agrees that none of the information concerning Inland or
> any Inland Subsidiary that is provided or to be provided by Inland
> to CSB for inclusion or that is included in the Proxy Statement and
> any documents to be filed with any Regulatory Authority in
> connection with the Contemplated Transactions will, at the
> respective times such documents are filed . . . be false or
> misleading with respect to any material fact, or omit to state any
> material fact necessary in order to make the statements therein not
> misleading.

Doc. 93-2 § 7.2.  In arguing that IBT violated this section by failing to disclose information

about its leveraged lending portfolio, CSB seeks to recover for the same allegedly fraudulent

statements and omissions the Court addressed with respect to CSB's fraudulent inducement

claim.  The Court has already concluded that CSB has not identified a genuine issue of fact as to

whether IBT made false or misleading statements or material omissions in its regulatory filings

concerning its leveraged lending portfolio.  The fact that IBT's expert testified that regulators

would have wanted to know specifics about IBT's leveraged lending portfolio in considering the

Merger Application does not affect this conclusion where CSB and IBT's expert have not

identified any requirement that IBT have separately addressed its leveraged lending program

instead of including information about it as part of its reporting of commercial and industrial

loans.  Because the Court does not find an issue of fact on whether IBT provided any misleading

---

[6] In its reply brief, IBT argues that it did not cause any of the damages CSB suffered from any alleged
delay in notification and that CSB had the duty to mitigate its damages.  Because IBT only raised this
argument in reply, the Court does not address it.  *See Dexia Credit Local v. Rogan*, 629 F.3d 612, 625
(7th Cir. 2010) ("[A]rguments raised for the first time in a reply brief are waived.").

information or omitted material information from the Merger Application, the Court enters judgment for IBT on this aspect of CSB's breach of contract claim.

### C. Actions to Impair, Delay, or Prevent the Consummation of the Merger (Section 7.5)

Next, CSB claims that IBT breached its negative covenant not to "take any affirmative action, or fail to take any reasonable action within its control, the effect of which would be to materially impair, delay, or otherwise prevent the consummation of the" merger. *Id.* § 7.5(b). CSB contends that IBT breached this provision by continuing to grow its leveraged lending portfolio in the face of both internal and external concern that the FDIC would regard such growth negatively. IBT argues, however, that the increase in leveraged lending took place before it entered into the Merger Agreement and that IBT had only minimal loan growth after it entered the Merger Agreement and before the FDIC revoked approval of the merger. But IBT's leveraged lending increased from $85.97 million to $111.59 million from September 30, 2014, to March 31, 2015, a rather significant amount. IBT cannot show that a reasonable juror could not find that such an increase materially impacted the merger, particularly in light of the FDIC's ultimate withdrawal of regulatory approval based in part on concerns with IBT's leveraged lending portfolio. The jury must address this factual question as well.

### D. Termination of the Merger Agreement (Section 11.1)

Finally, CSB claims that IBT improperly terminated the Merger Agreement because IBT's conduct, not CSB's, made consummation of the merger impossible. IBT's June 2, 2015 termination letter generically gave notice of the termination of the Merger Agreement pursuant to § 11, stating further that "[i]n addition to any other basis for termination and not in limitation thereof," CSB had not fulfilled all conditions precedent to closing. Doc. 93-63 at 2. Section 11.1(f) provides for termination of the Merger Agreement "by the board of directors of either

party if . . . final action has been taken by a Regulatory Authority whose approval is required in connection with this Agreement and the transactions contemplated thereby, which final action (A) has become unappealable and (B) does not approve this Agreement or the Contemplated Transactions." Doc. 93-2 § 11.1(f). The parties do not dispute that the FDIC refused to lift the suspension of the merger by that point, meaning that the parties could not consummate the transaction and providing a valid basis for IBT's termination of the Merger Agreement pursuant to § 11. Although IBT singled out CSB's failure to fulfill all conditions precedent in the termination letter, that letter generally referred to § 11 of the Merger Agreement as the basis for termination and indicated it did not limit the termination to CSB's failure to fulfill all conditions precedent. Therefore, because a valid basis existed for IBT to terminate the Merger Agreement, CSB cannot establish a breach based on IBT's allegedly improper termination of that agreement. *See Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 589 (7th Cir. 2000) ("If a party has a legal right to terminate the contract . . . its motive for exercising that right is irrelevant. The party can seize on a ground for termination given it by the contract to terminate the contract for an unrelated reason.").

### III. Damages

Because the Court finds that several claims against IBT remain viable, it must address IBT's request that the Court limit the damages CSB may recover on these claims. Specifically, IBT argues that CSB cannot recover damages based on NexBank's withdrawn August 2014 offer. "The basic principle for the measurement of contract damages is that the injured party is entitled to recover an amount that will put him in as good a position as he would have been in had the contract been performed as agreed." *Roboserve, Inc. v. Kato Kagaku Co.*, 78 F.3d 266, 273–74 (7th Cir. 1996) (quoting *Collins v. Reynard*, 607 N.E.2d 1185, 1186, 154 Ill. 2d 48, 180

Ill. Dec. 672 (1992)). This means "an amount equivalent to the difference between the benefits it actually received and those to which it was due under the Agreement—but no more." *Id.* Compensatory damages for fraud claims "are intended to compensate for any injury which is the direct and natural consequence of [the plaintiff's] acting on the faith of defendant's representations." *Id.* at 273–74 (alteration in original) (quoting *Gold v. Dubish*, 549 N.E.2d 660, 666, 193 Ill. App. 3d 339, 140 Ill. Dec. 9 (1989)). "Damages for fraud are typically calculated using the benefit-of-the bargain rule, where the plaintiff's recovery is limited to an amount needed to compensate for the loss occasioned by the fraud." *Sheth v. SAB Tool Supply Co.*, 990 N.E.2d 738, 758–59, 2013 IL App (1st) 110156, 371 Ill. Dec. 550 (2013). Regardless of how calculated, "[d]amages for common law fraud are not intended to restore what one never had." *Roboserve, Inc.*, 78 F.3d at 274.

CSB claims its damages are comprised of the difference between what it would have received had it accepted NexBank's August 2014 offer and what it actually received from NexBank in December 2015. CSB provides no support for its attempt to base its damages calculations on NexBank's August 2014 offer, which NexBank withdrew before CSB entered into the Merger Agreement with IBT. Using this amount falls outside of the scope of allowable damages for breach of contract and fraud claims. Therefore, the Court agrees that CSB cannot use this offer to recover damages for IBT's alleged fraud and breach of contract, which would allow it to recover "for the loss of contractual benefits it never actually secured."[7] *Id.* This does not prevent CSB from establishing damages based on admissible calculations of its injuries.

IBT also argues that CSB cannot recover consequential losses for any proven breach of contract, relying on the Merger Agreement's limitation of damages provision. CSB disclaims

---

[7] The Court will address any specific uses of the withdrawn offer in CSB's expert's opinion, to the extent necessary, in an appropriate motion to exclude the expert testimony.

any request for consequential damages for its remaining breach of contract claims, and so the Court does not address this argument further.[8]

**CONCLUSION**

For the foregoing reasons, the Court grants in part and denies in part IBT and the Directors' motion for summary judgment [94].  The Court enters judgment for IBT and the Directors on the fraudulent inducement claims (Counts I and II) and for IBT on the claims for breach of §§ 7.2 and 11.1 of the Merger Agreement.

Dated: March 19, 2019

_____
SARA L. ELLIS
United States District Judge

---

[8] To the extent a dispute exists as to whether the contract damages CSB seeks are properly recoverable under the contract, the Court will address specific arguments at or prior to trial.